*Decision will be entered under Rule 50.*

DENCO LUMBER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WENCO, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 85529, 85530. Filed October 2, 1962.

*Gene W. Reardon, Esq.,* and *Fred W. Mattson, Esq.,* for the petitioners.

*Joseph D. Skinner, Esq.,* for the respondent.

TRAIN, *Judge:* The respondent determined deficiencies in the income tax of petitioners for the years and in the amounts as follows:

| | Docket No. | Year | Deficiency |
|---|---|---|---|
| Denco Lumber Company | 85529 | 1954 | $79,243.15 |
| | | 1955 | 64,223.74 |
| Wenco, Inc | 85530 | 1955 | 63,954.22 |

The sole issue for decision is whether petitioners are entitled to report the sale of certain homes on the installment method of accounting.

## FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

The petitioners, Denco Lumber Company (hereinafter sometimes referred to as Denco) and Wenco, Inc. (hereinafter sometimes referred to as Wenco), are Colorado corporations with their principal place of business in Denver, Colorado. The Federal income tax returns of Denco for its taxable years 1954 and 1955 and of Wenco for its taxable year 1955 were filed with the district director of internal revenue, district of Colorado.

During the taxable years, each of the petitioners contemplated engaging in the real estate business of subdividing land into home building sites, constructing low-priced houses on those lots and selling houses and lots to prospective individual home buyers. Before construction, Denco began negotiations with the Colorado Federal Savings and Loan Association (hereinafter referred to as Colorado Savings) for the purpose of obtaining financing. These negotiations resulted in Colorado Savings agreeing to make first trust deed loans, equal to the cost of land and house construction, to Denco on the houses it planned to build. The lending association made such a loan commitment because of its prior satisfactory lending experience with the individual organizers and operators of Denco.

Pursuant to its commitment, Colorado Savings made 20-year first trust deed loans to Denco on 68 of its houses built in 1954 and 56 of its houses built in 1955. Generally, obtaining such loans was delayed as long as possible in order to keep interest costs to a minimum. Some of these loans were made in groups or blocks before home buyers had been procured and as finance money was needed. To evidence each such loan, Denco gave Colorado Savings its promissory note secured by a first trust deed on each house at the time the loan was made. The first trust deed loans bore interest at the rate of 6 percent with principal and interest payable monthly. The amount of each loan was approximately 65 percent of the selling price of the home, the amount of the loan being in excess of the cost of the lot and home. Colorado Savings would not have made such loans to the individual buyers of the Denco homes under these conditions and terms of financing.

Before construction, the organizers of Wenco entered into financing negotiations with Guardian Savings and Loan Association (hereinafter referred to as Guardian Savings). These negotiations resulted in a written commitment by Guardian Savings to make first trust deed loans to Wenco. Originally, the commitment provided for the lending association to approve the credit of buyers of Wenco homes.

This requirement proved too severe because the first 15 home buyer applications were rejected by Guardian Savings. Further negotiations were had and as a result thereof Wenco deposited $20,000 with Guardian Savings as a guaranty against any delinquent payments on its first trust deed loans and Guardian Savings then relaxed its credit restrictions on buyer applications. Wenco also agreed to deposit an additional $300 for each house loan made to it.

Pursuant to its commitment and after the $20,000 guaranty fund had been deposited, Guardian Savings made 20-year first trust deed loans to Wenco on 55 of its houses built in 1955. To evidence each loan, Wenco gave Guardian Savings its promissory note secured by a first trust deed on each house at the time the loan was made. These loans bore interest at the rate of 6 percent, with principal and interest payable monthly. Each loan was approximately 65 percent of the selling price of each home, the amount of the loan being slightly in excess of the cost of the house and lot. Guardian Savings would not have made such loans to the individual buyers of Wenco homes under these conditions and terms of financing.

Petitioners entered into the financial arrangements with Guardian Savings and Colorado Savings to make certain that they had adequate financing for the homes they intended to build.

The houses built by Denco in 1954 and 1955 and Wenco in 1955 were low-priced, cheaply constructed frame houses which were built on a mass-production basis. The Denco houses were in a substandard area through which unattractive Weir Gulch ran. The Wenco homes were also in a substandard area; that is, they were in close proximity to industrial plants, railroad tracks, and stockyards.

There were several types of homes built and sold by petitioners. There was a two-bedroom house without a basement, a two-bedroom home with a basement, a three-bedroom house without a basement, a three-bedroom house with a basement, and a split-level house. None of the houses could qualify for VA, GI, or FHA financing. The physical condition of the houses when sold was merely a shell without improvements such as landscaping, incinerators, garbage disposals, storm doors and windows, garages, fences, or clotheslines.

Petitioners were seeking to capture as a market for the sale of their homes the individual home buyer who could not afford to make a downpayment. Generally, these potential buyers could not qualify for home loans because of poor credit or lack of financial security or both. Petitioners advertised these homes for sale on the basis of (1) no downpayment, (2) minimum monthly payments at less than rent, and (3) the buyer being allowed income tax deductions for the interest and taxes included as part of their monthly payments.

Interested buyers made application to either Denco or Wenco. Their requirements were that the potential buyer have a job, no marital difficulties, and be able to make installment payments of $75 to $90 per month depending upon the size and type house selected. If the applicant appeared to be a potential buyer, the respective petitioner would obtain a credit report.

In 1954 Denco built and sold 68 homes with an aggregate selling price of $684,900 and 56 such houses in 1955 with an aggregate selling price of $572,500. In 1955 Wenco built and sold 55 homes with an aggregate selling price of $556,865.

With respect to 67 of the Denco houses sold in 1954 and 50 houses sold in 1955, where the deeds were given to the individual buyers at the time the homes were sold, the transactions were handled as follows: The buyer entered into a purchase contract and deposited with the real estate selling agent a nominal amount of cash, together with a note in a nominal amount to pay closing costs. At the time of closing, Denco executed its deed subject to the existing first trust deed, special improvement taxes, and Alsher Sewer lien, conveying the house and lot to the individual buyer. The purchaser made no cash downpayment but paid all or part of the closing costs. The purchaser assumed and agreed to pay the existing first trust deed which Denco had obtained from Colorado Savings on the property. The buyer also agreed to pay outstanding special improvement taxes for installation of streets, curbs and gutters, and the Alsher Sewer lien. The purchaser then gave Denco his promissory note, secured by a second trust deed for the balance of the selling price.

With respect to 44 of the Wenco homes sold in 1955, where the deeds were given to the individual buyers at the time the homes were sold, the transactions were handled as follows: At the time of the sale, Wenco executed its deed subject to the existing first trust deed and the Alsher Sewer, conveying the house and lot to the individual buyers; the buyers made no cash downpayment but paid the closing costs; the buyers assumed and agreed to pay the existing first trust deed loan that Wenco had previously obtained from Guardian Savings; the buyers agreed to pay the Alsher Sewer lien; the buyers then gave Wenco their promissory note, secured by a second trust deed on the house for the balance of the selling price.

The buyers of the Denco houses normally made their monthly payments to Colorado Savings. The purchasers of the Wenco houses normally made their monthly payments to Guardian Savings. The lending institutions applied these monthly payments to principal and interest on the first trust deed loans, tax and insurance reserves, special improvement taxes, and the balance, if any, was applied to interest on the second trust deed notes. The lending institutions received the

interest on the second trust deed notes for petitioners as an accommodation to them.

Denco, in 1954 and 1955, and Wenco in 1955 reported the gain from the sale of homes in those years on the installment method. In their Federal income tax returns, petitioners included in income in the year of house sale the excess of its first trust deed loan over its cost of each house. Accordingly, the second trust deed notes were listed at their face amounts in "Analysis of Home Sales on Installment Basis" schedules attached to the returns to show the total future reportable gains.

Respondent recognized and allowed Denco to use the installment method of reporting gain on one house sold in 1954 having a selling price of $9,500 and also the gain on six houses sold in 1955 having an aggregate selling price of $58,500. These seven houses were sold under contract where the deeds were not given to the respective buyers at the time of house sale.

Respondent denied Denco the use of the installment method of reporting gains on its sales in 1954 of 67 homes having an aggregate selling price of $675,400 and its sales in 1955 of 50 homes having an aggregate selling price of $514,000. The deeds to these 117 homes were given to the respective buyers at the time the homes were sold. Respondent determined that the gains from these sales were reportable on a deferred payment basis; that the Colorado Savings first trust deed loans on these sales are reportable on a deferred payment basis; that the Colorado Savings first trust deed loans on these houses, aggregating $469,100 for 1954 and $357,900 for 1955 are realized from and reportable in sales for such years; and that the fair market value of the second trust deed notes on these houses at the time of sale was equal to 80 percent of their face value or $164,880 for 1954 and $124,800 for 1955 and was reportable in sales for those years.

Respondent recognized and allowed Wenco the use of the installment method of reporting the gain on 11 houses sold in 1955 having an aggregate selling price of $110,080. These 11 houses were sold under contract where the deeds were not given to the respective buyers at the time of sale.

Respondent denied Wenco the use of the installment method on the remaining 44 houses sold in 1955, having an aggregate selling price of $446,785. The deeds to these 44 houses were given to the respective buyers at the time the house was sold. Respondent determined that the gains from these sales were reportable on a deferred payment basis; that the Guardian Savings and Loan Association first trust deed loans on these houses aggregating $297,100 for 1955 were realized from and reportable in sales for that year; and that the fair market value of the second trust deed notes on these houses at the time of sale was equal

to 80 percent of their fair amount or an aggregate of $119,748 which was to be reported in income for 1955.

In 1954 and 1955, Denco received 117 second trust deed notes from purchasers of its homes. The following schedules indicate the number and face amount of these notes:

| Number of notes received | Face amount of each note |
|---|---|
| 5 | $2, 750 |
| 96 | 3, 000 · |
| 2 | 3, 350 |
| 1 | 3, 600 |
| 13 | 3, 850 |

The amount of each second trust deed note was payable on or before 10 years but there was no provision therein for amortization of principal. These notes provided for 6-percent interest per annum, payable monthly.

In 1955, Wenco received 44 second trust deed notes from purchasers of its homes. The following schedule indicates the number and face amount of these notes:

| Number of notes received | Face amount of each note |
|---|---|
| 12 | $2, 995 |
| 1 | 3, 350 |
| 16 | 3, 500 |
| 14 | 3, 650 |
| 1 | 3, 950 |

The principal amount of each second trust deed note was payable on or before 10 years but there was no provision therein for amortization of principal. Each note provided for 6-percent interest per annum, payable monthly.

There were no payments made on the principal of the second trust deed notes of either Denco or Wenco in the years the homes were sold.

OPINION.

Petitioners were in the business of building and selling low-priced homes. With the exception of a few homes, petitioners obtained first mortgage loans on these homes prior to their sale. When a home was sold there was no downpayment by the purchaser. The purchaser assumed the first mortgage and gave the selling petitioner a second mortgage for the difference between the first mortgage and the selling price of the home. The purchase price was payable in monthly installments. The issue for decision is whether petitioners are entitled to report the income from the sale of these homes on the installment method as provided for in section 453, 1954 Code.

Income from the sale of real estate may be reported on the installment method if, in the taxable year of sale, there are no payments, or the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. Sec. 453, 1954 Code.[1] Section 1.453–4(c), Income Tax Regs.,[2] provides that:

In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and §§ 1.453–1 through 1.453–7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. * * *

The controversy between the parties involves the narrow issue of whether the "payments (exclusive of evidences of indebtedness of the purchaser)" exceeded 30 percent of the selling price of the homes in the year of sale. Notwithstanding section 1.453–4(c), Income Tax Regs., which respondent fails to cite or discuss, respondent has taken the untenable position that the entire amount of the first trust deed notes that were assumed by the purchasers of petitioners' homes constitute "payments" received during the taxable year so that the sum exceeds 30 percent of the selling price of each home. Respondent

---

[1] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—
    (1) GENERAL RULE.—Income from—
        (A) a sale or other disposition of real property, or
        (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,
may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).
    (2) LIMITATION.—Paragraph (1) shall apply—
        (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after [Aug. 16, 1954] the date of enactment of this title), only if in the taxable year of the sale or other disposition—
            (i) there are no payments, or
            (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.
        (B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44(b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44(a) of such Code.

[2] This provision has been in the regulations in substantially similar form since art. 44, Regs. 69, was promulgated Aug. 28, 1926. It has been carried through the following regulations: Art. 352, Regs. 74; art. 352, Regs. 77; art. 44–2, Regs. 86; art. 44–2, Regs. 94; art. 44–2, Regs. 101; sec. 19.44–2, Regs. 103; sec. 29.44–2, Regs. 111; sec. 39.44–2(c), Regs. 118.

admits that petitioners originally made the loans in question, that these mortgages were assumed by the purchasers of the homes, and that petitioners remained secondarily liable on the notes. It is respondent's contention that the method employed by petitioners in selling and financing the houses was a mere device to bring them within the provisions of section 453. Respondent contends that substance not the form employed in a transaction is what controls.

Respondent's position is arbitrary and unreasonable. The transactions involved in this case were not unreal or shams. Cf. *Higgins* v. *Smith*, 308 U.S. 473 (1940). The substance of what happened is exactly the form that it took. Cf. *Gregory* v. *Helvering*, 293 U.S. 465 (1935). It is clear from the facts of this case that there was a good business reason for the way in which petitioners conducted their business. Petitioners and their officers had good credit ratings. They obtained commitments for loans from Guardian Savings and Colorado Savings to make certain they would have construction financing for their homes. Furthermore, these homes were being sold to people who had poor credit ratings and little or no financial security. Generally, these people could not afford to make a downpayment on a home much less qualify for a first mortgage loan.

We hold that respondent's determinations were erroneous.

> *Decision will be entered under Rule 50 in Docket No. 85529.*
>
> *Decision will be entered for the petitioner in Docket No. 85530.*