Per Curiam :
This is another income tax case in which the ultimate issue is whether or not the taxpayers held certain real property primarily for sale to customers in the ordinary course of business. This is a question which must be decided on the particular facts and circumstances. See, e.g., Miller v. United States, 168 Ct. Cl. 498, 504, 339 F. 2d 661, 663-64 (1964); Garrett v. United States, 128 Ct. Cl. 100, 104, 120 F. Supp. 193, 195-96 (1954); Bauschard v. Commissioner, 279 F. 2d 115, 117-18 (C.A. 6, 1960). The facts in this case are *525 set forth in the findings made by Chief Trial Commissioner Marion T. Bennett which the court adopts. The gist of these findings is as follows: Joseph C. Browne, David C. Browne, and Robert E. Kanode were the stockholders in and the managers of Maryland Modern Housing Corporation (Housing), a company in the business of building and selling prefabricated houses in the Baltimore area. In 1951, they purchased (in the same ratio as their stockholdings) an undeveloped tract of land; they then had the land platted and subdivided, installed streets and storm sewers, and arranged for the extension of water, gas, and electricity to the area; through Housing, a model house was constructed on the tract on their behalf, and shown to the public; when it appeared that this type of house could be sold on the land, the tract was sold in 1956 to Housing at a price over five times the original cost to them and more than three times greater than their basis; Housing then continued the development and sold a number of units. Plaintiffs’ claim is that the tract was not acquired or held by them for the purpose of resale in the ordinary course of any business theretofore or thereafter engaged in by the Brownes and Kanodes as individuals. Commissioner Bennett has found to the contrary; he has concluded that on the weight of the evidence they were dealers in real estate and their profits on the sale of the land were made in the ordinary course of such business. On this record, we agree with that conclusion. In particular, when we put the developmental activities undertaken by the taxpayers before they sold the tract to Housing (their controlled corporation) together with other similar dealings of theirs involving Housing or other controlled companies (see findings 26-29), we find that this transaction fell outside of the provisions of the Internal Revenue Code of 1954 (Section 1221) permitting capital gains treatment of gains realized on the sale of certain property. See Bauschard v. Commissioner, supra, at p. 118; Kaltreider v. Commissioner, 255 F. 2d 833, 838-39 (C.A. 3, 1958); Engasser v. Commissioner, 28 T.C. 1173 (1957) ,[1]
*526 The decisions which plaintiffs cite as close to this case are readily distinguishable. In Gordy v. Commissioner, 36 T.C. 855 (1961), involving sales to controlled corporations, there was no showing of personal activities by the taxpayer-stockholder equivalent to the platting, subdividing, installation of streets, and utility arrangements in this case. Conversely, in Wagner v. Dudley, 58-2 CCH U.S. Tax Cas. ¶ 9589 (W.D. Pa., May 27,1958), the taxpayers did not control the vendee corporation. In Thomas v. Commissioner, 254 F. 2d 233 (C.A. 5, 1958), the taxpayers neither controlled the purchasing company nor engaged in extensive developmental activities preliminary to the sale. Here, we have substantial personal developmental activities, plus use of and sale to a controlled corporation which continued the development, plus some comparable purchases by taxpayers of other real estate for development.
The plaintiffs are not entitled to recover and their petitions are dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Chief Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiffs in these actions are as follows:
(a) No. 70-61, Helen K. Browne, Administratrix of the Estate of Joseph C. Browne (hereinafter referred to as J. Browne), and individually.
(b) No. 71-61, David C. Browne, brother of J. Browne (hereinafter referred to.as D. Browne), and Diana K. Browne.
(c) No. 72-61, Robert E. Kanode (hereinafter referred to as Kanode) and Audrey Lee Kanode.
2. The plaintiffs now reside, and did so reside during the period here involved, in Baltimore County, Maryland. They filed timely joint income tax returns for the calendar year 1956 with the District Director of Internal Revenue for the District of Maryland. Helen K. Browne was then the wife of J. Browne, who died on July 3, 1959. She was duly appointed administratrix of his estate by an order of the Orphans Court of Baltimore County, dated July 23, 1959. *527 Audrey Lee Kanode, who is the wife of Kanode, and Diana K. Browne, who is the wife of D. Browne, are only involved herein because of the filing of joint income tax returns with their husbands.
3. (a) On their joint income tax return for 1956, Joseph C. and Helen K. Browne reported ordinary taxable income of $50,215; net long-term capital gains of $57,064, of which $54,564 is concerned in the instant suit; and tax of $34,693, which was paid 'before April 15,1957.
(b) On their joint income tax return for 1956, David C. and Diana K. Browne reported ordinary taxable income of $33,718.63; net long-term capital gains of $12,731.57; and tax of $11,233.93, which was paid before April 15, 1957.
(c) On their joint income tax return for 1956, Robert E. and Audrey Lee Kanode reported ordinary taxable income of $35,992; net long-term capital gains of $32,376; and tax of $20,489, which was paid before April 15,1957.
4. In 1941, J. Browne, Kanode and one Nathan Posner (hereinafter referred to as Posner) organized the Maryland Modem Housing Corporation. On May 3, 1955, the name of the corporation was changed to the Maryland Housing Corporation (hereinafter referred to as Housing). This corporation was organized to engage in the building and sale of prefabricated houses in the Baltimore area. For a number of years it has had a license as a realtor. It has never formally declared any dividends.
5. At the time of the organization of Housing, J. Browne was in his mid-twenties. He was a graduate engineer from Temple University and had some building and construction experience. Kanode was a former attorney who had done considerable building and developing prior to 1940 and had a knowledge of the construction business. Posner was an attorney who knew Kanode and was J. Browne’s brother-in-law. Initially, they each owned one-third of the stock in Housing.
In 1946, D. Browne was discharged from the armed services, became associated in thé business, and purchased a one-sixth interest in Housing. Thereafter-and until 1950, J. Browne and Kanode each owned a one-third interest in Housing, and Posner and D. Browne each owned a one-sixth *528 interest. In 1950, Posner sold Ms remaining one-sixth interest to J. Browne, and thereafter, during the period here in issue, J. Browne owned 50 percent, Eanode 33% percent and D. Browne 16% percent of the stock of Housing.
6. In addition to manufacturing prefabricated houses, Housing has developed various tracts of land in the Baltimore area and has sold finished houses and lots to individual home buyers. During the years 1941 to 1944 it built and sold houses primarily in the 15th district of Baltimore County in the area known as Essex. During the war years, , 1944-1946, it did overseas packaging for the armed services. After the war it engaged in a series of home developments, particularly in the 13th district of Baltimore County. In chronological order these developments were as follows:

Michaelton Manor-Grott.. 1947 1949 1
Seven Oaks_ 1948 1952 55
516 Hilton Avenue_ 1948 1948 1
Poplar Avenue Extended_ 1948 1951 51
4314 Highview Avenue_ 1949 1950 1
Essex Property.. 1949 1952 1
Arbutus & Potomac Avenues». 1950 1952 1
Ten Oaks Road. 1951 1952 2
1322 Brooks Road.. 1951 1953 2
Knoll view_ 1951 1956 28
Tiepewood_ 1950 1956 72
Wynnewood_ 1954 1963 284
Sybert Farm-Columbia Hills». 1954 ([1]) [2] 63
Nelson Job__ 1954 1954 1
New York-Kirkhill_ 1954 1955 1
Donics-Knollview__ 1954 1955 1
Oak Park Property_ 1955 ([3]) ([3])
New Leeds Property_ 1957 1962 23
7. In 1946, Lumber & Millwork Company of Baltimore (hereinafter referred to as Lumber) was organized as a wholly owned subsidiary of Housing. It was organized because Housing had an inventory of lumber and the organizers had a location Which they felt was unusually good for the *529 retail lumber business. Because prefabricators bad difficulty at that time procuring materials from primary manufacturers, Lumber could also act as a procuring agency for Housing. Initially, it did act as a procuring agency for Housing, transferring materials to Housing at cost, plus a small markup. Lumber also sells to industrial concerns, builders and the general public. Its offices and yard were and are located at the same address as Housing.
8. The land and buildings occupied and used by Housing and Lumber are owned by Southwest Properties, Incorporated. It was organized on January 1, 1960, following the death of J. Browne, and its stock is owned by the plaintiffs, Helen K. Browne, Kanode and D. Browne.
9. Housing was managed primarily by J. Browne and Kanode, each of whom normally devoted his full time to its affairs. J. Browne was the operating head of Housing. Lumber was managed primarily by D. Browne, who normally devoted his full time and efforts to its affairs. None had any business interests outside the corporation. However, on matters of importance concerning either corporation, plaintiffs would confer and advise with one another. J. Browne and Kanode would, when necessary, spend time on the affairs of Lumber; D. Browne would, when necessary, spend time on the affairs of Housing; and there was no clear-cut division of authority. Each was fully aware of what the others were doing and generally was given the opportunity to participate in the business dealings of the others. In fact, Housing handles the payroll for both corporations; D. Browne was paid by Housing and Kanode received salaries from both corporations.
10. Except for the period ending in 1944, when J. Browne, Kanode and Posner had an arrangement under which they would be paid a percentage of the sales price of houses sold in the Essex area, plaintiffs were compensated solely by salaries from Housing and Lumber and did not receive any commissions.
11. Typically, in the development of a tract of unimproved land, Housing would have engineering studies made of the land and then subdivide it into homesites based upon zoning-regulations and requirements for utilities and streets. After *530 the plan of subdivision was approved by various county officials, a plat was recorded with the clerk of the county circuit court, which showed the shape, size, location and dimensions of each individual homesite. Utilities were installed, and sidewalks and drainage structures were constructed, if required. Housing would erect on the tract, or some other available site, a model or models of the homes they proposed to build in the subdivision. Housing would then advertise the subdivision and undertake, through its own full-time sales force, to sell houses to be delivered in the future to qualified buyers. A buyer would make a down payment and then Housing would obtain a building permit and build the house ordered. Upon completion of the house, the buyer would, pay for it and Housing would transfer title to the land to the purchaser. Housing only occasionally and in unusual circumstances sold unimproved land.
12. Kanode has never had a real estate license personally. D. Browne acquired a real estate agent’s license in about 1957. At the same time, Housing acquired a real estate license as •a realtor. This license has never been used by X). Browne.
13. In 1951, J. Browne lived in a house which he had built on Hilltop Boad near Wilkens Avenue. At that time the water for his house was secured from a brackish well which was unreliable as to supply and likely to become contaminated. He was eager to secure public water for his residence.
14. In September 1951, J. Browne observed a “for sale” sign on a 30-acre tract of land located near his residence. He decided that development of this' tract would cause an extension of public waterlines to the area by the county and that this would benefit his property. He asked Kanode to look into this possibility. Kanode did so, and after discussion J. Browne began negotiations for the purchase of the tract;
15. The tract, which was later given the name Knollview, was owned by James J. DeBoy, Inc. (hereinafter referred to as DeBoy), a corporation owned by Alfred Harris. A contract of sale of the property by DeBoy to J. Browne was entered into on September 26, 1951, for $30,000. This contract gave J. Browne “permission to clear, grade, test bore, *531 survey and stake the land.” On December 18,1951, the sale was fully consummated. At or about the same time, J. Browne offered D. Browne and Kanode the opportunity to participate by acquiring a 50-percent interest in the property. They immediately agreed to that proposal, with Kanode to participate to the extent of a 33%-percent interest in the property, and D. Browne to the extent of a 16%-percent interest in the property because that was the’ratio in' which they owned other properties. Record title, however, remained in the name of J. Browne.
16. Prior to the time plaintiffs acquired Knollview, DeBoy had employed Thompson, Grace & Mays, Inc. (hereinafter referred to as Thompson-Grace), engineers, to make a topographical survey and plan of development for the property. That work was incomplete when J. Browne agreed to purchase the property, but the engineering work done up to that time was included in the sale at no additional cost. Plaintiffs agreed to use Thompson-Grace to finish the engineering work by staking out lots and aligning streets in order to create the largest number of practical individual building sites adaptable to the area. Mr. Grace of Thompson-Grace recommended that 40 lots for individual building sites, varying in size from about half an acre to about 2 acres, was the maximum number that could be obtained from the tract, based upon the topography of the land and its susceptibility of improvement. Plaintiffs accepted that recommendation.
17. After. J. Browne had contracted to purchase the property, plaintiffs, in cooperation with Mr. Grace of Thompson-Grace, began working toward the preparation of a plat to record with the clerk of the court. This required that drawings for various phases of the plans be left for approval with the Department of Highways, the Health Department, the Department of Public Works, the Street Lighting Department, the Supervisor of Assessments, and the Water Service. Plans were also left with the Gas & Electric Company of Baltimore and with the Telephone Company. The plat may not be recorded until it has been approved and signed by the Department of Highways of Baltimore County and the Baltimore County Planning Commission. Although Mr. Grace was responsible for getting the approval of the various *532 county authorities, Kanode discussed several phases of the matter “very, very extensively and often” with the Director and Assistant Director of Public Works of Baltimore County, and with the Metropolitan Commission of Baltimore County. The plans were presented or filed on behalf of J. Browne because he was the owner of record. The plat of Knollview was filed on March 10,1952.
18. Shortly after J. Browne purchased Knollview, he hired H. O. Feror & Company (hereinafter referred to as Feror), excavating contractors, to grade the land and prepare it for street paving. J. Browne paid Feror $10,000 for that work which was completed by June 1952. Plaintiffs also arranged for the extension of water and gas to the area and they installed and paid for the roads, the paving and the storm drainage. The cost of Knollview to plaintiffs was as follows:
9/26/51 Deposit_ $3,000.00
12/18/51 On settlement_ 27, 000. 00
12/20/51 Commission_ 500. 00
1/10/52 Attorneys’ fees_ 239. 94
1/10/52 Make plats and divide into lots- 1, 088. 95
6/10/52 Grading_ 10, 000. 00
11/13/52 Paving_ 7, 500. 00
2/ 7/53 Paving_ 5, 800. 00
2/10/53 Blueprints_ 16. 48
2/ 6/53 Taxes_ 165. 76
55, 311.13
12/20/51 Refund of commission_ $500. 00
7/30/54 Refund paving- 3, 939. 21
- 4, 439. 21
Total (40 lots)_ 50,871.92
iss lots retained by Robert E. Kanode and
David C. Browne for personal residences- 3, 815. 40
Basis at date of sale_ 47, 056. 52
J. Browne initially paid all of the costs from his own funds, and D. Browne and Kanode reimbursed him for their shares.
19. On March 15, 1952, Housing applied, for a building permit, which was issued on April 7,1952, for the construction of a model house on the Knollview tract. Housing 'built the model house with its own funds but on behalf of plaintiffs who had agreed that, if there was a favorable response to that house from the public as to saleability, they would sell Knollview to Housing. If not, they would pay for the model house. The Knollview house was advertised by Hous *533 ing in the Baltimore newspapers and by a sign on the premises. Four or five thousand people paid $1 each to see it, and tentative sales were made, by Housing’s sales force, of 10 or 11 houses. On May 16,1952, Housing applied for four additional building permits which were issued on June 12, 1952. Thirty-three additional building permits were issued on August 22,1952.
20. On July 3, 1952, J. Browne wrote a letter to Housing offering to sell 37-lots in Knollview for $148,000. The offer provided that J. Browne was to pay the cost of street paving and storm drainage and procure the extension of water, gas and electric service to and throughout the property. It also provided for payment of $1,000 in 1952; $75,000 in 1953; and the balance in 1954. Plaintiffs had decided that the 40 lots were worth $160,000, over five times the original cost and more than three times greater than their basis, based on the market price of property in similar condition and on the fact that Housing had pre-sales of houses for the lots, and it would be an “extremely profitable” operation for Housing. Although the average price was $4,000 per lot, the value of the lots varied. On July 19, 1952, the board of directors of Housing met to consider J. Browne’s proposal. On that date, Housing wrote a letter to J. Browne accepting his offer of July 3,1952, on the basis of the terms offered and stating its intention to begin promptly the construction of homes on the property.
21. Of the 40 lots in the Knollview subdivision, 20 were allocated to J. Browne, 13% to Kanode, and 6% to T>. Browne. Kanode elected to retain one of his lots and D. Browne elected to retain two. D. Browne built his own residence on the lots he retained. Kanode later purchased a lot which had a house on it and transferred to Housing the lot he had retained in exchange for the lot under the house. The purchase price for the remaining 37 lots was allocated $80,000 to J. Browne, $49,333.33 to Kanode and $18,666.67 to D. Browne. J. Browne’s gain from the sale was $54,564, Kanode’s gain was $32,376, and D. Browne’s gain was $12,731.57.
22. On February 6, 1953, the Knollview property was deeded to Housing by J. Browne. However, plaintiffs did *534 not receive any funds representing Housing’s payment for the Knollview property until 1956 when they reported their respective gains from the sales as long-term capital gains. The delay was because Housing needed the money for other developments and Housing’s debts to them were not payable as long as it owed the Equitable Trust Company. Plaintiffs were willing to defer payment for as long as Housing needed the money. No evidences of indebtedness were issued by Housing and no interest was paid, although plaintiffs did discuss the matter of charging interest, but decided not to doso. .
23, The accounting records of Housing for the job costs of Knollview disclose the following job costs for Knollview during the period from December 1951 through June 80, 1956:
Fiscal period: Job coats
Décember 1951 through June 30, 1952- $2, 932. 66
July 1952 through June 30, 1953_ 323, 749.03
July 1953 through June 30, 1954____ 145,739.99
July 1954 through June 30,1955_-_ 66, 668.55
July 1955 through June.30,1956_ 17,866.18
Total_$556,'956.41
The total job costs of $556,956.41 included.$104,000 for the costs of 26 lots at $4,000 per lot. The total cost of $148,000 for the land was originally entered in a real estate investment account and a part of such cost (at $4,000 per lot) was charged to job costs as the houses were sold and settlement was made for the purchase price. The charges for each of the years ended June 30, 1953-1956, were as follows:

24. D. Browne did not actively participate in the work of developing Knollview. He had faith in the abilities and judgment of J. Browne and Kanode and was willing to pay his share of the costs without being consulted before the *535 expenses were incurred.
25. Plaintiff Kanode was of the opinion that $30,000 was a very low price for Knollview. Pie would have paid twice as much for it. Plaintiffs had anticipated that they might have to put out as much as $50,000 to extend the water main to the property, but they were able to avoid this cost when, the county assumed the responsibility of extending the main. Their valuation of the property at $160,000 reflected other market sales in the area and the fact that Housing had successful pre-sales for 10 or 11 houses on the lots.
■26. In 1954 or 1955, plaintiffs organized Columbia Hills Corporation (hereinafter referred to as Columbia), which bought a 140-acre farm in Howard County and has developed the land under the name of Columbia Hills. J. Browne owned 50 percent, Kanode 33% percent and D. Browne 16% percent of the stock. Housing purchases lots from Columbia as it builds on them. All except three of the houses in this development have been built by Housing, which through 1963 had completed 63 units. Housing purchases lots from Columbia for $2,500 or $3,000 each as it builds houses in this development.
27. In 1957 plaintiffs acquired a 140-acre tract of land near Montevideo Hoad, which was zoned industrial. J. Browne and his wife owned 50 percent, Kanode and his wife 33% percent, and D. Browne and his wife 16% percent of the tract, none of which has been developed.
28. During the development of Housing’s Seven Oaks project, the school board located an elementary school on part of the tract, which left one part disconnected from the residential land and unsuitable for residential development. Plaintiffs planned to develop that piece as a shopping center, so they organized a corporation known as Southwestern Center and sold that land to it. Plaintiffs were equal owners of Southwestern Center. They were unsuccessful in their efforts to have that land rezoned, but sold it to the State of Maryland for the Baltimore County Beltway in 1955. Southwestern Center was then dissolved and the proceeds distributed to plaintiffs.
29. In 1956, J. Browne and D. Browne, using their proceeds from Southwestern Center, with Edward Warren ac *536 quired for development a tract called Hunt Club Estates. Mr. Warren and J. Browne put in the utilities. Houses were furnished by Housing to Garman Brothers for construction, and Mr. Warren acted as sales agent. The development was incomplete in 1963. Kanode did not participate because he had invested in a farm in Baltimore County and did not have the money.
30. On their respective income tax returns for the year 1956, plaintiffs reported their gain from the sale of Knollview as long-term capital gain. The Commissioner of Internal Revenue disallowed capital gains treatment and assessed deficiencies against plaintiffs. Those deficiencies were paid and timely claims for refund were filed. Those claims were disallowed by letter dated June 3,1960.
Ultimate Finding
31. Plaintiffs contend the Commissioner of Internal Revenue was in error in disallowing long-term capital gains treatment to the individual plaintiffs for the profit realized on the sale of the Knollview property to Housing; that Knoll-view was acquired by plaintiffs because of the favorable price and because of the desire of J. Browne to get water for his personal residence and was not acquired or held by plaintiffs for the purpose of resale in the ordinary course of any business theretofore or thereafter engaged in by any of them.
Defendant maintains, on the contrary, that (a) the Commissioner was correct and that the property was held for resale in a trade or business carried on by plaintiffs either individually or through their corporation, producing ordinary income; (b) as an alternative, plaintiffs’ Knollview project was in the nature of a joint venture, producing ordinary income, or that payments were, in substance, dividend distributions from Maryland Housing Corporation; or (c) as a second alternative, the plaintiffs did not hold the property for 6 months before sale and thus have not met the time requirements for long-term capital gains treatment of the profits on such sale.
It is found from the weight of the evidence that plaintiffs were dealers in real estate and that their profits on the sale *537 of Knollview were made in the ordinary course of such business.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and their petitions are dismissed.

 Property held for sale to a single customer can meet the requirements of Section 1221(1). Nielsen v. United States, 333 F. 2d 615 (C.A. 6, 1964) ; Patterson v. Belcher, 302 F. 2d 289, 294 (C.A. 5, 1962), cert. denied, 371 U.S. 921; Jantzer v. Commissioner, 284 F. 2d 348 (C.A. 9, 1960) ; Pennroad Corp. v. Commissioner, 261 P. 2d 325, 330 (C.A. 3, 1958), cert. denied, 359 U.S. 958 (1959).

 Uncompleted.

 This property is owned by another corporation (see finding 26) from which Housing buys lots and the number of units shown are those purchased and developed through 1963.

 Sold as an entirety in 1963 after preliminary engineering, but before establishing the number of units.