ROBERT A. BOYER AND MARJORIE A. BOYER, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3708–70, 3709–70, 3742–70. Filed May 17, 1972.

---

[1] Cases of the following petitioners are consolidated herewith: Charles W. Brooks and Jewel Brooks, docket No. 3709–70; and B Investments Co., Inc., docket No. 3742–70.

*John L. Flynn,* for the petitioners.
*Lee A. Kamp,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in the income taxes of petitioners as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Robert A. Boyer and Marjorie A. Boyer | 3708–70 | 1966 | $1,413.00 |
| | | 1967 | 3,327.00 |
| | | 1968 | 5,135.00 |
| Charles W. Brooks and Jewel Brooks | 3709–70 | 1966 | 1,011.14 |
| | | 1967 | 1,728.42 |
| | | 1968 | 3,665.29 |
| B Investments Co., Inc. | 3742–70 | FYE July 31— | |
| | | 1967 | 795.00 |
| | | 1968 | 838.00 |
| | | 1969 | 23.00 |

The three cases were consolidated for trial because of common factual and legal issues. At trial, three issues were presented for our determination. However, on brief, respondent conceded one of the issues so there remain but two issues for our decision: (1) Whether income realized by petitioners Robert A. Boyer and Charles W. Brooks from the 1968 sale of a 9.96-acre tract of land jointly owned by them should be taxed as long-term capital gain or as ordinary income; and (2) whether respondent may allocate rental income due but unpaid from petitioners' wholly owned corporation, B Developers, Inc., to a partnership consisting of the three petitioners under section 482 of the 1954 Code.[2] Respondent's allocation of income increased the partnership's gross income by $7,500 in 1966, by $10,000 in 1967, and decreased its gross income by $3,722.25 in 1968.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

---

[2] 1954 Internal Revenue Code unless specifically designated otherwise.

Charles W. Brooks (hereinafter sometimes referred to as Brooks) and Jewel Brooks, husband and wife, resided in Medford, Oreg., when they filed the petition herein. During the calendar years 1966 through 1968 they filed joint income tax returns with the district director of internal revenue, Portland, Oreg.

Robert A. Boyer (hereinafter sometimes referred to as Boyer) and Marjorie A. Boyer, husband and wife, resided in Medford, Oreg., when they filed the petition herein. For the calendar years 1966 through 1968, they filed joint income tax returns with the district director of internal revenue, Portland, Oreg.

B Investments Co., Inc. (hereinafter sometimes referred to as B Investments), is a corporation organized under the laws of the State of Oregon, with its principal place of business located at Medford, Oreg., when it filed the petition herein. It filed its corporate income tax returns for the years 1966 through 1968 with the district director of internal revenue, Portland, Oreg.

On April 4, 1966, Brooks and Boyer entered into an earnest-money agreement with O. Gordon Hudson and wife, Ralph Thompsen and wife, and Joe Hearin and wife for the purchase of a parcel of land located in the city of Medford, Oreg. The exact size of the parcel was undetermined but it was estimated to contain between 25 and 30 acres. The earnest-money agreement stated the purchase price to be $6,000 an acre, but if the total exceeded $150,000 the purchasers could limit the purchase to 25 acres. The purchase price was to be paid $15,000 down and the balance not later than October 1, 1966. The agreement also recited that it was understood that the purchasers were entering into the agreement for the purpose of subdividing the property and selling lots in the subdivision and provided for a refund of the downpayment if approval of the subdivision could not be obtained.

On May 25, 1966, the sellers conveyed 12.5 acres to Brooks and Boyer by warranty deed, and petitioners paid an additional $60,000 on the purchase price. Petitioners had begun surveying and platting this land, identifying it as Country Club Meadows Tract I (hereinafter sometimes referred to as tract I). On June 7, 1966, an additional 12.5 acres, tract II, were conveyed to Brooks and Boyer, which were designated Country Club Meadows Tract II. The final contiguous parcel, 8.325 acres of Country Club Meadows, which did not constitute a part of either tract I or tract II, was conveyed to petitioners on July 2, 1968. A later survey of the entire purchase determined the total amount of land to be approximately 33 acres.

B Developers, Inc., an Oregon corporation with its principal office located in Medford, Oreg., was chartered on May 11, 1966. The initial capital in the corporation consisted of $25,000 subscribed and paid in

cash equally by petitioners Brooks, Boyer, and B Investments, who were the only shareholders. Each shareholder owned 83½ shares of the corporation stock which had a par value of $100 per share. In addition to the initial paid-in capital, at its inception B Developers obtained an unsecured $45,000 loan at 7-percent interest from B Investments. B Developers, Inc., reported its income on the basis of a fiscal year ending March 31.

Under date of May 12, 1966, Brooks and Boyer entered into a land sales contract with B Developers whereby they agreed to sell tract I to the corporation at a price of $12,000 an acre, for a total purchase price of $160,000. The agreement provided that B Developers was to pay $25,000 upon execution of the agreement with the remaining balance of $135,000 to be paid in monthly installments of not less than $2,000. As purchaser, B Developers was also required to get approval of the proposed subdivision plan before the transaction could be completed. Legal title to the property was to remain in the names of Brooks and Boyer with the provision that they would convey title to any portion of tract I to B Developers upon its payment of $13,500 an acre for the released land. During the years in question, as a lot was sold, Brooks and Boyer would convey title to the lot through B Developers to the ultimate residential purchaser. Petitioners Brooks and Boyer reported the income from the tract I sale on an installment basis and all gain was reported as short-term capital gain.

In April of 1968, Brooks and Boyer entered into an agreement with B Developers to sell it an additional 9.96 acres of tract II for $100,000, or $10,000 an acre. By purported terms of the agreement,[3] B Developers was to make a $3,000 downpayment with $55,000 due in 3 months. The remaining balance, $42,000, was subject to negotiation between the parties. Again the two vendors kept legal title to the property and the supposed contract contained a provision for release of the lands to the corporation as payment was made therefor. The 1968 income tax returns of Brooks and Boyer indicated their receipt of $50,000 each from B Developers for the purchase of tract II, the gain therefrom being reported as long-term capital gain.

On June 27, 1966, B Developers and Brooks and Boyer and their wives executed a note payable to Commonwealth, Inc., for $191,000 secured by a mortgage on tract I. The money was borrowed to develop tract I by installation of streets, sewers, and other improvements. Subsequently, improvements were made to tract I at a cost of $120,537.49. Charles W. Brooks supervised performance of the contracts for con-

---

[3] At trial, the land sales contract for B Developers' purchase of tract II was not introduced into evidence. Testimony by Robert A. Boyer and a carbon copy of an earnest-money receipt were adduced to establish the existence and terms of the contract.

struction of the streets, sewers, and other improvements as an officer of B Developers, but he received no salary for this particular work. A schedule was drafted to indicate the description of tract I lots, the asking price for each lot, and its cost. The projected asking price for all the lots totaled $339,050 and the projected cost totaled $280,537.49. By the end of its fiscal year, March 31, 1970, B Developers had sold all but 7 or 8 of the 42 lots in tract I, most of them for a price less than the projected asking price, and had experienced a loss on its residential development operations in each of the years 1966, 1967, and 1968.[4]

Also, following the contract for sale of tract II in June of 1968, B Developers and Brooks and Boyer, together with their wives, mortgaged tract II with the United States National Bank of Oregon to secure a $152,500 loan for B Developers, ostensibly for improvement of this second parcel. The settlement statement relative to this loan indicates the proceeds were disbursed $83,667.77 to settle the corporation's obligation to Commonwealth, Inc., under the prior $191,000 loan, $55,197.90 to petitioners Brooks and Boyer as sellers, $10,802.93 to B Developers, and the balance for payment of costs. During the years in question, improvements were made to tract II at a cost of $84,884.74. A schedule drafted to indicate the description of tract II lots, their asking prices and costs, reflects a total asking price of $258,250 and total costs of $184,884.74. All of the 31 lots in tract II except 3 were either sold or under option to sell by the end of B Developers' fiscal year ending March 31, 1970. However, this development activity also generated an annual operating loss.[5] The lots of tract II consistently sold for between $1,500 and $2,000 less than the asking price Brooks and Boyer had set, purportedly with the advice and approval of B Investments.

Throughout the development and sale of both tract I and tract II B Developers' land sales division had no employees for subdividing, construction, or sales of the lots in Country Club Meadows. Attendantly, Brooks and Boyer had not at any time, in their individual capacities, engaged in subdividing, developing, advertising, promotion, or any activity leading to sale of any lots in either tract I or tract II.[6] Most of the lots were sold to contractors who built houses on them for ultimate purchasers.

From 1966 through 1969 Robert A. Boyer was self-employed as a practicing attorney with his offices in Medford, Oreg. Petitioner

---

[4] These annual losses arose from the fact that the small gross profit experienced on the sales of the lots was insufficient to meet even the annual interest obligations of the corporation due on its loan from B Investments, the loans secured by mortgages on tract I and tract II, and the outstanding balance of the purchase prices on tract I and tract II owed to Brooks and Boyer.

[5] See fn. 4 for explanation.

[6] Brooks Construction Co., owned by Charles W. Brooks, did build two houses at cost on tract I lots as a means of stimulating the subdivision's lot sales.

Charles W. Brooks was also self-employed at all relevant times herein as owner of a restaurant and Brooks Construction Co.

Both petitioners have, throughout the years, engaged in numerous passive real estate investment activities. During the years in question Boyer was a partner in seven or eight partnerships which were involved in the holding or use of land.[7] Petitioner Brooks, in addition to his various land partnerships with Boyer, was a partner in a venture to construct the Tiki Lodge Motel in 1966, the motel being subsequently operated for a short period and sold at a gain. Brooks Construction Co. also built two brick office buildings in 1965 which Brooks held and rented until 1967, when he sold them for no gain. Neither Brooks nor Boyer owned any interest in B Investments, however, nor was either individual an officer or employee of the corporation.

Brooks, Boyer and B Investments Co., Inc., is a partnership which was organized on March 1, 1966. The partnership is composed of petitioners Brooks, Boyer, and B Investments, each as owner of a one-third interest in the partnership. The records of the partnership are maintained on the basis of cash receipts and disbursements.

On March 1, 1966, the partnership purchased the Fluhrer Building for a lump-sum price of $224,078.85. For the 4 months following the purchase date it collected all rents and paid all the expenses of the Fluhrer Building, reflecting all revenues and expenditures on its records. However, by a written lease agreement dated June 30, 1966, the partnership leased the office building to B Developers for a term of 10 years at a gross rental of $15,000 a year. The agreement[8] provided that the real property taxes were to be paid by the partnership while B Developers was responsible for the payment of the fire insurance on the building. Boyer testified that the full amount of the annual rent was payable at the end of each year of the lease.

---

[7] The partnerships were as follows:

1. Boyer, Brooks, Brooks and Brooks partnership owned a resort lodge.

2. Brooks, Brooks and Boyer partnership owned various parcels of unimproved land in Curry County and Jackson County, Oreg.

3. Dynamic Enterprises partnership owned a ranch, a five-eighths interest in 73 acres located in the city of Ashland, Oreg., and a nine-sixteenths interest in another 365-acre ranch.

4. Boyer had a partnership with two Ashland attorneys which held a lease on an interchange site of an interstate highway subleased to an oil company and a motel. The partnership also owned a pancake house restaurant and a service station in Roseburg, Oreg.

5. Boyer and Bashaw partnership owned unimproved property in Jacksonville, Oreg.

6. Boyer and Sterton partnership was formed in 1967 to purchase and renovate the Queen Building in Medford, Oreg.

7. The Boyer and Brooks partnership, which purportedly sold Country Club Meadows to B Developers and which owned two or more other pieces of property, was another of petitioners' activities.

8. Brooks, Boyer, and B Investments partnership owned the Fluhrer Building in Medford, Oreg., leased to B Developers.

[8] The lease was not entered into evidence at trial because it was destroyed in a fire that consumed the Fluhrer Building in February of 1969. Apparently no copy of the lease was available.

From July 1, 1966, B Developers collected all rents from the Fluhrer Building and paid its operating expenses. Carl Bismark, who manages B Investments and is vice president of B Developers, was chosen to manage the office building for B Developers at a salary of $400 a month.

During the first year of the rental term, July 1, 1966, to June 30, 1967, B Developers did not make any rental payments to the partnership as required by the lease. During the second year two rental payments were made—the first in the amount of $5,000 made on November 15, 1967, and the second in the amount of $15,000 made on February 29, 1968. On December 30, 1968, in the third year of the lease, B Developers paid the real estate taxes on the building in the amount of $3,722.25. Two months later, in February of 1969, the Fluhrer Building was destroyed by fire.

For the fiscal years ending March 31, 1967, 1968, and 1969, B Developers collected rents from the Fluhrer Building tenants in the amounts of $31,768.93, $43,883.82, and $38,901.82, respectively. The operating expenses and salaries paid for maintenance of the building during those years were approximately $15,750, $23,500, and $21,000, respectively.

When B Developers leased the building from the partnership in 1966 it was in disrepair and it was not fully occupied. In the course of the first year's operations under the lease, B Developers spent $11,705.12 to improve the appearance of the building and to refinish some of the offices for its new tenants. Additionally, the corporation aggressively sought new tenants to rent the unoccupied offices. The reason the rental payments were not made by B Developers to the partnership for its first year under the lease was because the corporation's current rental receipts from its tenants were used to fund the improvements to the Fluhrer Building in lieu of borrowed money and the corporation was also in a tight cash position because of its real estate development activities.

The partnership included in its income for its calendar years 1966, 1967, and 1968 only the actual amounts it received or constructively received as rental during those years, being zero for 1966, $5,000 in 1967, and $18,722.25 in 1968. It deducted taxes and depreciation on its partnership returns for those years. The partners, petitioners herein, reported their respective shares of the partnership income or loss on their individual returns. Respondent determined that the full amount of the rental payments due from B Developers to the partnership should be allocated to the partnership in each of these years, resulting in additional income of $7,500 to the partnership in 1966, $10,000 in 1967, and an overpayment of $3,722.25 in 1968. The resulting adjust-

ments in the taxable incomes of the partners give rise to the second issue we must decide.

OPINION

*Issue 1. Real Estate Sales Transactions*

The first issue is whether Brooks and Boyer are entitled to treat their profit from the sale of tract II to B Developers as capital gain or ordinary income. To decide this issue we must determine whether tract II was property held by them primarily for sale to customers in the ordinary course of their trade or business, within the meaning of section 1221,[9] when they sold that property. The question is entirely a factual one and requires an objective rather than a subjective approach. *Kelley* v. *Commissioner*, 281 F. 2d 527 (C.A. 9, 1960) ; *Bauschard* v. *Commissioner*, 279 F. 2d 115 (C.A. 6, 1960) ; *Robert W. Pointer*, 48 T.C. 906 (1967), affd. 419 F. 2d 213 (C.A. 9, 1969) ; *S. O. Bynum*, 46 T.C. 295 (1966) ; *Ralph J. Oace*, 39 T.C. 743 (1963).

With regard to the first issue, petitioners Brooks and Boyer premise their position upon the separateness, for tax purposes, of B Developers and themselves. They contend that all transactions involving the real property conveyed by them to B Developers were conducted by the corporation alone, and that as a result they were not individually engaged in the real estate business. Furthermore, petitioners emphasize that they were engaged in no sales or promotional activities with respect to tract II lots, they retained title to the property only as security for the purchase price due, and B Investments owned one-third of the equity interest in B Developers and had complete veto power over all real estate transactions between B Developers and Brooks and Boyer.

Respondent on the other hand, places considerable reliance on the fact Brooks and Boyer participated in the development of the land, in setting prices on the lots, and in obtaining financing so B Developers could proceed with its improvement plans. Respondent contends both petitioners bought the property with an initial intent to subdivide and develop it, and they carried out their plan with the use of B Developers, the plan being to sell tracts I and II to the corporation at artificially high prices, thus prematurely squeezing out all potential gain from the finished operation at capital gains rates. Thus, respondent

---

[9] Pertinent parts of sec. 1221 provide :

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business ;

argues B Developers acted as a conduit or agent in completing the development and sale of the property for Brooks and Boyer.

A compendium of the circumstances and facts surrounding the 4-year development and sale of tracts I and II of Country Club Meadows clearly indicates respondent was correct in his determination with regard to Brooks and Boyer. We believe the evidence presented in the record as a whole supports his position that B Developers acted as an agent or alter ego for both petitioners when it subdivided and sold tract II lots in Country Club Meadows. Certainly, the evidence is insufficient to prove error in respondent's determination. Consequently, the activities of B Developers with regard to Country Club Meadows are attributable to Brooks and Boyer making them real estate developers or dealers and, as such, their profits from the sale of tract II are taxable as ordinary income. See *Johnson* v. *United States*, 188 F. Supp. 939 (N.D. Cal. 1960).

Petitioners argue that their investments in real estate were all personal and passive and did not constitute the business of dealing in real estate. Those passive real estate partnerships, however, are not of primary concern here. We are more concerned with their activities and objectives relative to the Country Club Meadows acreage which they bought and sold to B Developers shortly thereafter for about twice the price they paid for it. Their dominance over B Developers and their dealings with it lead us to believe there was not a true arm's-length relationship in the entire Country Club Meadows development venture. A hand-in-glove operation, such as this, where a few shareholders control a corporation and act as its executive officers, will always draw our close scrutiny, and the burden is on the taxpayer to prove the existence of two separate bona fide interests. Cf. *Darco Realty Corp.* v. *Commissioner*, 301 F. 2d 190 (C.A. 2, 1962), affirming a Memorandum Opinion of this Court; *Kaltreider* v. *Commissioner*, 255 F. 2d 833 (C.A. 3, 1958), affirming 28 T.C. 121 (1957).[10]

We are convinced that Brooks and Boyer intended from the outset to subdivide and develop the Country Club Meadows property and that the formation of B Developers and sale to it of tract I for twice the price they paid for it immediately after they had acquired the land was part of a preconceived plan to insulate Brooks and Boyer from the real estate development business so they could siphon off most if not all of the profits from the Country Club Meadows project at capital gains rates. We also believe this plan carried through the transfer and development of tract II and the sale of lots therefrom. This conviction is supported by the earnest-money agreement with the original

---

[10] See also *H-H Ranch, Inc.*, T.C. Memo. 1965-119.

owners of the land which recited that the buyers intended to subdivide and sell the land and Boyer's attempts to get the land rezoned for residential use; by evidence that Brooks and Boyer set the price on the sale to the corporation and that the corporation actually lost money on the development and sale of both tracts I and II because of the artificially inflated price it paid for the property and the interest due on the sizable amounts it had to borrow to buy the property and develop it; by evidence that Brooks and Boyer controlled the operations of the corporation and apparently were the only individuals who participated in the development of the property, B Developers having no other employees working on the development; and evidence that Brooks and Boyer arranged financing for the corporation by cosigning the notes evidencing the loans, a part of the proceeds of which were used to pay them the purchase price of the property. See *Kaltreider* v. *Commissioner*, *supra; Robert W. Pointer, supra; Browne* v. *United States*, 174 Ct. Cl. 523, 356 F. 2d 546 (1966).

Petitioners contend that B Investments, as a one-third owner and substantial creditor of B Developers, had absolute veto power over all of B Developers' real estate activities. We are not at all persuaded that this unique power ever really existed; and certainly there is no evidence that it was ever exercised. Carl Bismark, as representative of B Investments, is alleged to have participated in the affairs of B Developers. However, we find only one document in evidence bearing his signature. No written evidence was produced to substantiate the existence of the claimed veto power of B Investments. Neither Bismark nor any other representative of B Investments took the witness stand during the trial to substantiate Boyer's testimony in this regard. This fact was unmentioned and unexplained at the trial and gives rise to the assumption that had such testimony been offered it would have been unfavorable to petitioners. *Wichita Terminal Elevator Co.*, 6 T.C. 1158 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947). We are also somewhat mystified as to why Brooks and Boyer were paid the purchase price of the property while no payments had been made on the $45,000 loan made by B Investments to B Developers up to the time of the trial.

Another factor we feel compelled to mention is the lack of solid evidence in the record to establish the sale of tract II to B Developers. No formally executed and recorded land sales contract for tract II was offered in evidence as was offered with respect to the sale of tract I. Instead, we are asked to accept that there was such a sale on the basis of Boyer's testimony and an unacknowledged and unrecorded carbon copy of an earnest-money agreement between Brooks and Boyer as individual sellers and as purchasers for the benefit of B Developers. This evidence is not persuasive in light of the close relationship between petitioners and the corporation.

The rule is settled that a person may engage in a business via an agent and the activities of the agent for the benefit of the principal will be imputed to the principal. *Kaltreider* v. *Commissioner, supra; Achong* v. *Commissioner*, 246 F. 2d 445 (C.A. 9, 1957). In our opinion that rule is appropriately used here, *Raymond Bauschard*, 31 T.C. 910 (1959), aff'd. 279 F. 2d 115 (C.A. 6, 1960). Had petitioners truly intended that the corporation develop this property as an independent business venture, the property would have either been acquired by the corporation in the first instance or it would have been transferred to the corporation at a price which would have permitted the corporation to make a profit on the venture. Instead, it is our conclusion that the controlled corporation was simply used by Brooks and Boyer to develop the land for them so they could take the profits of the venture out as capital gain. Looking through the form of the arrangements to the substance we find that Brooks and Boyer were real estate dealers with respect to tract II and that their gain on the sale of this property was ordinary income. Compare *Royce W. Brown*, 54 T.C. 1475 (1970), aff'd. 448 F. 2d 514 (C.A. 10).

We therefore find for respondent on this first issue.

## Issue 2. Allocation of Rental Income

Petitioner B Investments joins Boyer and Brooks on this second issue. The question presented here is whether the Commissioner acted within his authority granted under section 482 when he allocated to petitioners' partnership rental income due it from B Developers but unpaid during the years at issue. Again we must deal with the transactions between closely associated entities; Brooks, Boyer, and B Investments were equal partners in the partnership and each owned a one-third interest in B Developers.

Petitioners contend that respondent is not entitled to allocate rental income between B Developers and the partnership under section 482 [11] for the reason that B Developers experienced no actual net income to pay its rent obligations. Citing *Bush Hog Manufacturing Co.*, 42 T.C. 713 (1964), and *Smith-Bridgman & Co.*, 16 T.C. 287 (1951), they argue that respondent cannot base his determination upon the *power* of the owners to shift income or deductions so as to result in the evasion of tax or to incorrectly reflect income; there must be actual income

[11] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

realized for section 482 to be applicable, and respondent has no authority to create income where none exists.

What respondent maintains, in substance, is that petitioners operated their corporation, B Developers, in such a manner that it would not realize any net income. He alleges that the substantial rental income earned by the corporation was used to renovate the Fluhrer office building, or that it was offset by B Developers' losses on the development of Country Club Meadows tracts I and II, thereby giving the appearance that no income was available to pay the $15,000 annual rent due the partnership as lessor. According to his argument, under a bona fide arm's-length agreement the lessee, B Developers, would never have been allowed to continue its lease of the Fluhrer Building without paying the annual rent. Thus, in his view he is acting reasonably by using his section 482 power to allocate the rental income of B Developers to the Brooks, Boyer, and B Investments partnership.

Separate businesses owned and controlled by the same taxpayers may enter into transactions *inter se* and, if fair, or resulting from an arm's-length bargaining, such transactions will not be disturbed. *Ballentine Motor Co.*, 39 T.C. 348 (1962), affd. 321 F. 2d 796 (C.A. 4, 1963). Where there is a separate intelligible and bona fide business purpose other than tax avoidance, petitioner may be able to establish the Commissioner's misdirected use of section 482. See *Commissioner v. First Security Bank of Utah*, 405 U.S. 394 (1972); *Interior Securities Corp.*, 38 T.C. 330 (1962); *Vardeman v. United States*, 209 F. Supp. 346 (E.D. Tex. 1962); *Tillotson v. McCrory*, 202 F. Supp. 925 (D. Neb. 1962).

On the other hand, the Commissioner's authority to allocate income and deductions to clearly reflect income is broad and extends to any case in which by either inadvertence of design the taxable income, in whole or in part, of a controlled taxpayer is other than it would have been had the taxpayer in the conduct of its business been an uncontrolled entity dealing at arm's length with another uncontrolled entity. *Advance Machinery Exch. v. Commissioner*, 196 F. 2d 1006 (C.A. 2, 1952), certiorari denied 344 U.S. 835 (1952); see also sec. 1.482–1(c), Income Tax Regs. Decided cases also make it clear that the Commissioner has wide discretion in applying section 482, and that the determinations he makes pursuant thereto will be sustained unless the taxpayer establishes that the Commissioner has abused his discretion. *Hamburgers York Road, Inc.*, 41 T.C. 821 (1964); *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953).

Here it is clearly evident that the Commissioner did not abuse his discretionary authority when we consider his determination in light

of the factors upon which he based the allocation. Certainly there is the requisite ownership and control between the two entities (lessor and lessee) to justify his use of section 482. *Hamburgers York Road, Inc., supra.*

In addition, we agree with respondent that normally a lessor does not allow his lessee to delay rent as it comes due. This is especially true where the lessee has ample income to make the payments. We do not believe, as petitioners would have us do, that B Developers had no income from its rental operations. With rental receipts of $31,768.93, $43,883.82, and $38,901.82 in 1967, 1968, and 1969, respectively, and operating expenses of only $15,750, $23,500, and $21,000 in the same years, respectively, we must find, as respondent did, that there was sufficient net rental income available in each year to pay the partnership its rent.

Petitioners argue that there was no income available because B Developers had to use $11,705.12 of the "net profit" in 1966 to renovate the Fluhrer Building in order to attract new tenants. Granted, this was a justified expense based on a bona fide business purpose. Nevertheless, we think petitioners' argument is irrelevant, for the fact remains that B Developers owed the partnership rent under its lease arrangement, and in an arm's-length agreement that money would have to be paid if there was sufficient income available.

This appears to be a classic situation for the application of section 482. Petitioners were in a position to control the taxable income of both entities by determining when the rent would be paid. While it may have been in the best interest of both entities to use the rental income to improve the property, we have no sound evidence that the lessee was required by the terms of the lease to pay for such improvements. Absent such a requirement the owner-lessor, to whose benefit the improvements would ultimately inure, would pay for such improvements. But by permitting B Developers to use the rental income to make the improvements instead of paying the rent due to the petitioner-owners, petitioners reduced their own taxable income and B Developers offset the rental income against its losses on the real estate venture and also amortized the cost of the improvements. In short, petitioners were in a position to manipulate the taxable income of both entities to obtain tax advantages. Whether done for tax purposes or not this was the result of B Developers' failure to pay the rent when it was due. The purpose for enactment of section 482 and its predecessors was to give respondent the authority to allocate income among related entities to prevent the evasion of taxes by the shifting of profits or when it is necessary to clearly reflect the taxable income of those

entities. *Hamburgers York Road, Inc., supra.* This is what respondent has done in this case and we find that he was clearly acting within his authority in doing so.

This issue is decided for respondent.

*Decisions will be entered under Rule 50.*