ALBERT W. TURNER and THERESE L. TURNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Turner v. Commissioner
Docket Nos. 1904-70, 1902-70.
United States Tax Court
T.C. Memo 1974-264; 1974 Tax Ct. Memo LEXIS 55; 33 T.C.M. (CCH) 1167; T.C.M. (RIA) 740264; October 9, 1974, Filed. Wallace E. Whitmore and W. Stephen McConnell, for the petitioners. Thomas C. Morrison, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income *56 tax: Docket No.
Petitioners
Taxable year ended
Deficiency 1904-70
Albert W. Turner and Therese L. Turner
12/31/62
$82,490.00
12/31/63
86,890.34
12/31/64
71,541.00
12/31/65
[2] 23,550.63 1902-70
Herndon G. Kilby
12/31/62
24,852.21
and Margaret M.
12/31/63
7,469.57
Kilby
12/31/64
8,787.94
12/31/65
7,537.00
The following issues remain to be decided: (1) Whether gains from the sale of certain real estate were ordinary income or long-term capital gain; (2) The amounts of the total contract price, gross profit, and payments in the year of sale arising from the sale of certain real estate on the installment method; and (3) Whether certain payments by a corporation to its shareholders were taxable dividends or nontaxable repayments of their loans to the corporation. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. The individual petitioners filed their respective *57 joint Federal income tax returns for the years in question with the district director of internal revenue, Baltimore, Maryland, [3] and resided in Prince Georges County, Maryland, when they filed their respective petitions in this Court. Albert W. Turner (hereinafter called Turner) has worked throughout his life in the construction business, particularly the building of houses in the Maryland suburbs of Washington, D.C. During his summer vacations from high school, Turner worked as a laborer in his father's house building business. After Turner's graduation from high school in 1934, he worked as a carpenter on various jobs in Prince Georges County, Maryland. In 1937, when he was twenty-one years old, Turner started his own business of building and selling houses. By 1943, he had built and sold to customers between ninety and one hundred houses in the Hyattsville, Maryland, area. In that year, Turner enlisted in the United States Navy and thereafter served thirty months in the South Pacific as a carpenter's mate with the Seabees. Following his discharge *58 from the Navy in 1946, Turner built eleven houses in Montgomery County, Maryland. He next purchased a tract of land in Hyattsville known as the Lewisdale subdivision and proceeded to build and sell houses there. During the course of this construction at Lewisdale, Turner incorporated his business, previously operated as a proprietorship, as his wholly-owned corporation named Albert W. Turner, Inc. This corporation continued to build and sell houses at the Lewisdale subdivision, which numbered some one hundred houses when completed. The corporation employed Herndon G. Kilby (hereinafter called Kilby) on a part-time basis as a construction supervisor of the Lewisdale project. Hollywood Subdivision. On April 21, 1949, Turner contracted to purchase 107.4001 acres of unimproved land in College Park, Prince Georges County, Maryland, known as the Hollywood tract. Turner considered this land suitable for immediate residential development and the eventual construction of a small shopping center. He hired and paid an engineering firm to conduct a boundary and topographic survey of the tract and prepare a preliminary plan of subdivision. In May 1949, he submitted the preliminary *59 plan, which subdivided the tract into 595 lots, to the county planning commission and the county sewer commission for their necessary approval. Turner also applied to the sewer commission for an extension of existing water and sewer lines to service the Hollywood subdivision. Turner meanwhile negotiated with the Veterans Administration (VA) to obtain a commitment of VA financing for the sale of houses in the Hollywood subdivision. He thought that the most successful arrangement for selling the houses would be a combination of a VA-guaranteed mortgage for the price of each house and a redeemable ground lease of each lot. Redeemable ground leases were a common form of residential real estate financing in Maryland at the time and met with the VA's approval. In order to further promote the sale of houses, Turner consented to the VA's request that he set the annual ground rent of each lot at five percent of the redemption price, rather than the six percent rate then prevailing in Maryland. In June 1949, the VA issued its commitment to Turner, and he was then able to obtain commitments from mortgage lenders to provide the necessary construction financing and purchase money financing *60 of the Hollywood subdivision. On June 28, 1949, Turner paid in cash the purchase price of $59,960.04 and took title to the Hollywood tract. On September 20, 1949, Turner and Kilby formed a corporation (hereinafter called MCD) to engage in the business of residential construction. Turner and Kilby each contributed $10,000 to MCD in exchange for 50 shares each of the corporation's capital stock. The ownership of MCD thereafter remained the same, except that in 1951 Turner and Kilby each sold one share of their MCD stock to a different employee of the corporation, thereby reducing their interests to 49 percent each. Turner was president, Kilby was secretary and treasurer, and they and their respective wives were the four directors of the corporation. At its first meeting, held on September 21, 1949, the board of directors of MCD resolved that the corporation should enter into ground leases with Turner covering specified lots in the Hollywood subdivision and should proceed to build houses thereon. At the insistence of the construction lender, however, Turner and MCD subsequently agreed to defer the creation of any ground rents on the lots until the construction mortgage was *61 released from each lot as each house was completed and sold. On September 30, 1949, Turner [4] recorded the plat of the Hollywood subdivision and thereby dedicated to public use the streets indicated on the plat. Wtihin the next month the county planning and sewer commissions granted their final approval to the plan of subdivision. MCD thereafter proceeded to build houses on the lots. It hired and paid an engineering firm, the same one that Turner had previously employed, to conduct the field layout of the streets and to supervise their construction by a subcontractor. MCD also reimbursed Turner for the expenses he incurred in obtaining commitments for the construction financing and purchase money financing of the Hollywood subdivision. Early in 1950, the county sewer commission *62 authorized the extension of water and sewer lines to service the Hollywood subdivision. Turner subsequently tendered to the commission the refundable cash escrow deposits which it required from developers as a condition to such an extension of water and sewer lines to their subdivisions. In the case of each house and lot in the Hollywood subdivision sold to an individual purchaser subject to a ground rent, the following transactions occurred on the date of settlement. Turner executed a ground lease of the lot to MCD for a term of 99 years, renewable forever, and redeemable at any time at the option of the lessee upon payment to the lessor of the specified redemption price. The annual ground rent was to be six percent of the redemption price of the lot. Simultaneously with the execution of the ground lease, Turner and MCD executed an agreement on behalf of themselves and their assigns that for a period of five years the ground rent was reduced to five percent of the redemption price of the lot in consideration of the lessee's promise not to redeem the ground rent until the expiration of that same period. MCD then sold the house and assigned the ground lease to the purchaser. *63 When the homeowner desired to redeem the ground rent, he paid the redemption price to Turner and received a deed to the lot in fee simple. The following table shows the amounts of rental income Turner received from the redeemable ground leases he created in connection with MCD's sale of houses in the Hollywood subdivision, the number of lots redeemed from ground rent in each year, and Turner's gains on such redemptions: [5]
Year
Rental Income
Number of Redemptions
Gain on Redemption 1950
$ 350.00
-
$ -
1951
17,260.19
-
-
1952
22,645.75
1
1,402.67
1953
23,900.00
1
1,152.67
1954
21,28 7.46
6
7,416.02
1955
23,198.72
17
20,595.39
1956
23,460.38
22
26,608.74
1957
24,501.20
20
25,103.40
1958
23, 616.42
26
28,001.86
1959
20,287.67
46
49,837.70
1960
19,168.27
24
26,938.41
1961
17,762.58
12
13,123.26
1962 9,216.99
22
23,991.32
1963
12,793.48
36
40,378.58
1964
12,609.60
20
21,835.84
1965
6,604.00
13
15,243.00
196 6
8,036.00
7
8,729.00
1967
7,215.00
3
2,966.00
1968
7,304.00
6
6,424.00
1969
6,203.00
3
3,216.00
1970
6,338.00
4
4,611.00
1971
6,001.00
4 4,369.00
293
*64 As of December 31, 1971, Turner retained 73 ground rented lots in the Hollywood subdivision upon which he was still collecting rental payments. In his Federal income tax returns, Turner reported his gains resulting from the redemption of ground rented lots in the Hollywood subdivision as long-term capital gain. With respect to the redemptions occurring during the years at issue herein, respondent determined that Turner held the lots in question for sale to customers in the ordinary course of his trade or business and, therefore, that the gains on their redemption were ordinary income. In 1950 and 1951, Turner sold 38 lots in the Hollywood subdivision to the purchasers of houses which MCD built on the lots and who were unwilling to ground rent their lots. They either paid cash or used some other form of financing to buy the houses and lots. Late in 1950, the Federal Reserve Board issued Regulation X, which imposed restrictions on the terms of residential real estate financing. Turner thought that, while these restrictions were in effect, the sale of houses in the Hollywood subdivision would proceed more successfully through conventional financing rather than VA financing *65 and ground leases of the underlying lots. He consequently expected to discontinue the practice of ground renting individual lots to the purchasers of houses in the subdivision and, instead, to sell most of the remaining lots to MCD prior to its construction and sale of houses. On May 19, 1951, Turner sold to MCD 177 lots in the Hollywood subdivision for $154,500. MCD paid $1,000 in cash and gave its unsecured, non-interest bearing promissory note for the balance. Turner agreed to buy back from MCD any lots which individual customers might want to acquire on the basis of VA home financing and redeemable ground leases. MCD eventually built houses on 119 of these lots and sold them to customers. MCD found that some prospective customers still wanted to purchase houses through VA financing and ground leases on the underlying lots. On November 14, 1952, MCD therefore returned to Turner 58 of the 177 lots it had previously purchased. Turner credited the purchase price of the 58 lots against MCD's note and gave MCD his own promissory note in an amount covering the cost of the improvements MCD had already made on those lots. MCD later built houses on the 58 lots and sold them to *66 individual purchasers subject to redeemable ground rents reserved to Turner in the manner previously described. MCD's debt to Turner arising from the sale of the lots was paid off as follows: Original sales price (177 lots)
$154,500.00
Credit for 58 lots returned
50,627.04
103,872.96
Cash payments: 1951
$ 1,000.00
1956
1,000.00
1957
15,000.00
1964
86,872.96
103,872.96
$ -0-
For Federal income tax purposes, Turner reported his gain on the sale of lots to MCD on the installment method and according to an undisputed gross profit ratio of 88.8495 percent. The parties dispute the character of the gain reportable on the one installment payment received during the years at issue herein. Turner reported it as a long-term capital gain. Respondent determined that it was a gain upon the sale of property held for sale to customers in the ordinary course of a trade or business and, therefore, ordinary income. In 1954, Turner sold 13 unimproved lots in the Hollywood subdivision to a church for use as its building site. In 1963, Turner sold 3 unimproved lots [6] in the Hollywood subdivision for a total of $9,000. MCD was *67 unable to build houses on these lots because of a defective subsoil condition. Turner reported the undisputed gain of $7,798.11 on the sale as a long-term capital gain. Respondent determined it was gain upon the sale of property held for sale to customers in the ordinary course of a trade or business and, therefore, ordinary income. The following is a summary of Turner's disposition of the 595 lots in the Hollywood subdivision: Sold to individual buyers in fee simple
1950
13
38
1951 25 38
Sold to MCD in 1951
177
Less: lots returned in 1952 58 119
Lots ground rented (including 58 lots returned from MCD)
366
Sold to church in 1954
13
Sold in 1963
3
Retained for development as Hollywood Shopping Center
56
595 lots
Carrollton Subdivision Between April and December of 1951, Turner purchased for a total price of $168,161.84 four continguous parcels of unimproved land in Prince Georges County totaling 337.5050 acres and later known as the Carrollton *68 tract. Water and electricity lines were immediately available to the tract, but the closest sewer trunk line was then several miles away. Turner considered the Carrollton tract suitable for residential and commercial development as soon as the sewer was extended into the vicinity, and he expected to be able to procure such an extension within a year or two. Turner hired and paid an engineering firm to conduct a boundary and topographic survey of the Carrollton tract and prepare a preliminary plan of subdivision. He later submitted the preliminary plan of subdivision to the county planning commission and the county sewer commission for their necessary approval prior to development. Turner meanwhile contacted several adjoining landowners and sought their assistance in obtaining sewerage for the area. On December 20, 1951, Turner and the adjoining landowners filed an application with the county sewer commission for an extension of the sewer trunk line to service their property. On May 9, 1952, the commission notified Turner, as spokesman for the group of applicants, that the necessary construction costs of the proposed sewer extension were deemed to be excessive for the time being *69 and the application was therefore denied. Turner nevertheless remained confident that he could procure sewerage for his property within a few years at the most and continued his efforts toward that end. Late in 1951, MCD was nearing completion of the Hollywood subdivision and was interested in obtaining land for its next residential development. Turner discussed with Kilby his acquisition of the Carrollton tract, and they agreed that MCD should develop the entire tract except for whatever portion Turner decided to retain for commercial development. They decided that rather than buying all the land at one time, MCD should purchase the land in smaller sections as they were needed for development. This would minimize the corporation's outstanding purchase-money liabilities at any one time and thus facilitate its ability to obtain equipment and construction financing from outside lenders. On March 10, 1952, at a meeting of the board of directors of MCD, Turner formally offered to sell part of the Carrollton tract to MCD for residential development in the near future, on condition that MCD would bear all costs of procuring sewerage for the area, make all deposits and contributions *70 required for that purpose by the county sewer commission, and pay for the layout and grading of streets in the Carrollton subdivision so they would be ready for the installation of sewers. The corporation indicated its desire to purchase the land and agreed to Turner's conditions. In that same month, Turner granted to the county board of education options to purchase two designated parcels of land in the Carrollton subdivision as sites for the construction of an elementary school and a junior high school to serve the future residents of the subdivision. By the end of 1952, MCD had made substantial progress in the layout and grading of streets in the Carrollton subdivision, and its architects were designing and drawing plans for the houses to be built there. After it was decided that the Carrollton subdivision would be MCD's next project, Turner investigated the possibility of incorporating the subdivision as a separate municipality within the county. He concluded that it would be a good method to facilitate the development of the subdivision as a planned community. A municipality would have the power to levy taxes, maintain streets, sidewalks, landscaping and other public *71 improvements, and provide municipal services. It would be entitled to a fixed share of state funds for highway maintenance and might also hasten the extension of the sewer trunk line into the area. Turner instructed W. Carroll Beatty (hereinafter called Beatty), his personal attorney and general counsel of MCD, to perform the legal services incident to the organization of the municipality and to secure the necessary approval of the state legislature and the governor. On April 11, 1953, a law was enacted incorporating the residents and landowners of the subdivision as the City of Carrollton, effective as of the following June 1. The law named Turner, Kilby, Turner's father, Beatty, and another attorney who did work for MCD and was a business associate of Turner as the first city councilmen. Their successors were to be elected by the residents and landowners of the city at biennial elections beginning in June 1954. The councilmen elected Turner as the first mayor of the city, and he continued in that office until June 1958, when the residents of the subdivision first gained control of the city council. On April 13, 1953, MCD recorded the plats of the first two sections of *72 the Carrollton subdivision, representing itself to be the owner of the property and dedicating to public use the streets indicated on the plats. The county planning and sewer commissions gave their final approval to the subdivision plan within the next month, without any commitment, however, as to when the sewer trunk line would be extended into the area. On April 27, 1953, Turner agreed to sell to MCD 85.5732 acres of the Carrollton tract for $238,834.72. On May 15, 1953, Turner conveyed the property to MCD for $8,000 in cash and MCD's unsecured promissory note for the balance of the purchase price, payable within five years and bearing interest at 4-1/2 percent per annum payable annually. In July 1953, the county sewer commission again rejected a renewed request for sewerage as too expensive. Turner and Beatty met with the governor and members of his staff to protest the commission's delay. In August, Turner offered to pay interest at the prevailing rate on the commission's costs of constructing the sewer extension until 750 houses could be served by the new sewer. He further offered to make cash escrow deposits with the commission to be refunded when 220 houses were connected *73 to the new sewer. The commission rejected these offers, however, and Turner subsequently threatened to sue the commission or build the houses with septic tanks if it persisted in its refusal to authorize the sewer extension. On September 28, 1953, Turner waived the accrual and payment of interest on MCD's note for the purchase of land in the Carrollton subdivision until MCD began building houses thereon. Turner and MCD expected that no such construction would begin until the sewer trunk line was extended into the subdivision. On October 26, 1953, the board of directors of MCD decided that the corporation should purchase suitable land elsewhere for immediate residential development while it was waiting to start the construction of houses in the Carrollton subdivision. In December of that year, MCD purchased from an unrelated seller 54 lots in Prince Georges County known as the Lewis Heights subdivision for $5,000 in cash and its promissory note in the amount of $35,500 payable within ten years and bearing interest at five percent per annum payable semiannually. MCD built houses on each of the lots and sold them all to customers by early 1955. In December 1954, MCD, still *74 awaiting the extenstion of sewerage to the Carrollton subdivision, purchased from Turner's father and his partner 53 lots adjacent to the Hollywood subdivision and known as the Hollywood Addition. MCD gave its mortgage for the entire purchase price of $51,900, payable within two years and bearing interest at the rate of five percent per annum payable semiannually. MCD built and sold 53 houses in the Hollywood Addition. On January 4, 1954, Turner and six adjoining landowners, including a number of corporations other than MCD, again filed an application with the county sewer commission for an extension of the sewer trunk line into their area. The applicants represented that they were all engaged in the construction business primarily within Prince Georges County, that they intended to construct over 4,000 houses in the area including the Carrollton subdivision, and that this proposed construction program was primarily dependent upon the availability of county sewer facilities. Shortly thereafter, MCD for the first time notified the commission that it also was interested in the extension of the sewer into the Carrollton subdivision and planned to build a first section of 220 houses *75 there as soon as sewerage was available. Turner continued to negotiate with the sewer commission for the next several months in order to resolve the disagreements existing between it and the group of applicants. On January 18, 1955, the commission finally authorized the proposed sewer extension on condition that the interested landowners contribute a total of $40,000 toward the necessary construction costs. MCD then tendered to the commission the $18,083 which was determined to be the share of the required contribution allocable to the Carrollton subdivision. The extension of the sewer trunk line and installation of lateral sewers connecting to the Carrollton subdivision were completed by the end of the following year. During 1955, MCD procured a commitment from the VA to guarantee the financing of houses in the Carrollton subdivision. It then obtained from mortgage lenders the necessary construction loans and commitments for permanent financing of the houses. By the end of that year, MCD was able to enter into contracts of sale for the first houses of the subdivision, settlement to take place as soon as the sewer was completed. On March 3, 1956, Turner sold 9.5 acres *76 in the Carrollton subdivision to the county board of education as a site for an elementary school. On August 29, 1956, Turner sold 12.4136 acres to MCD for $37,240.80. This land was part of a larger tract of some 135 acres adjacent to the Carrollton tract which Turner had purchased about a year earlier. MCD paid $6,852.50 in cash to release an existing purchase money mortgage on the property and gave Turner its unsecured promissory note for the balance of the purchase price, payable within five years and bearing interest at the rate of 4-1/2 percent per annum payable annually. On that same date, MCD also paid $1,000 on account of the principal of the note which it had previously given to Turner for the purchase of 85.5732 acres of the Carrollton tract. Turner agreed to further waive the accrual and payment of interest on that note. He cited the past delays in the construction of the sewer extension and the resulting inability of MCD to build and sell houses on the land as his reason for waiving interest on the note. In addition to the sales referred to above, Turner made the following sales of land in the Carrollton subdivision to MCD as it needed such land for the construction *77 of more houses. In each case MCD gave Turner its unsecured, non-interest bearing promissory note payable on demand for the balance of the purchase price in excess of the cash down-payment: Date of sale
Acreage
Price
Cash down payment 1/3/57
24.07
$ 77,024.00
$16,024.00
5/20/57
24.66
78,912.00
20,000.00
3/14/58
38.60
123,520.00
13,520.00
11/19/58
20.5724
65,831.68
831.68
10/12/59
35.36
113,152.00
10,936.96
9/30/61
28.1138
89,964.16
-0-
In November 1957, MCD purchased from an unrelated seller 99.599 acres of land adjacent to the Carrollton tract for a purchase price of $209,250.20. MCD paid $25,092.60 in cash and gave a mortgage for the balance, payable within 10 years and bearing interest at the rate of 5 percent per annum, payable semiannually. On August 3, 1959, Turner sold 17.0954 acres of the Carrollton tract to the county board of education as the site for a junior high school. MCD completed its operations in the Carrollton subdivision by 1962. It built and sold some 2,000 houses there. Turner retained the remaining land in the Carrollton subdivision for nonresidential development. In 1961, he transferred some *78 5.5 acres of such land to a wholly-owned corporation, Carrollton Enterprises, Inc., for the construction of the Carrollton Shopping Center. He later transferred another parcel of about five acres to a joint venture of which he was a member for the construction of a motor inn and restaurant. MCD made the following payments on the notes which it gave to Turner for the purchase of land in the Carrollton subdivision: Date of sale
Acreage sold
Year of payment
Amount of payment 5/15/53
85.5732
1956
$ 1,000.00
1957
2,834.24
1958
25,000.00
1971
70,036.00
8/29/56
12.4136
1958
30,388.30
1/ 3/57
24.07
1961
61,000.00
5/20/57
24.66
1966
58,912.00
3/14/58
38.60
1963
110,000.00
11/19/58
20.5724
1964
32,500.00
1970
32,500.00
10/12/59
35.36
1962
102,215.04
9/30/61
28.1138
1971
89,964.16
On his Federal income tax returns, Turner elected to report his income from the sale of land to MCD on the installment method, [7] and he characterized such income as long-term capital gains. With respect to the installment payments Turner received during the years at issue in this case, respondent determined that such income *79 arose from the sale of property to customers in the ordinary course of a trade or business and, therefore, should be characterized as ordinary income rather than long-term capital gains. MCD's next project was the Calverton subdivision in the Beltsville area of Prince Georges County and Montgomery County, Maryland. In connection with this project, MCD made the following purchases of land, all of which were from unrelated sellers: Date
Acreage
Price 10/31/60
384.0000
$ 960,318.50
4/25/61
16.9700
52,000.00
5/11/61
16.0273
41,670.98
5/29/61
126.4065
386,579.00
6/19/61
5.5637
13,909.25
7/16/62
58.2025
263,822.00
MCD built and sold 1,480 houses and a number of apartment buildings in the Calverton subdivision by the time it was completed in 1968. Turner purchased two parcels of land adjacent to MCD's in *80 the Calverton subdivision and retained them for the construction of additional apartment buildings and the Calverton Shopping Center. Kettering Subdivision On June 5, 1961, Turner purchased 476.4245 acres of farmland in Largo, Prince Georges County, Maryland, known as the Calvert tract. He paid $104,813.37 in cash and gave his promissory note in the amount of $419,253.58 for the balance of the purchase price, secured by a first deed of trust and bearing interest at the rate of six percent. By early 1965 Turner had reduced the balance of this note to $251,552.14. He paid for a boundary survey of the Calvert track but took no further steps toward subdividing or improving the property. About the same time that Turner was negotiating to purchase the Calvert tract, he was also making inquiries, both individually and in his capacity as president of MCD, regarding the availability of land adjacent to the Calvert tract and known as the Belt tract. Turner had long been interested in acquiring the Calvert and Belt tracks because of their proximity to Washington, D.C., and their location in the path of suburban expansion. Turner thought that the Calvert and Belt tracts could be used *81 for residential and commercial development as soon as water and sewer lines were extended into the area, which he expected to occur within the next several years. While Turner was successful in purchasing the Calvert tract in 1961, he discovered that the owner of the Belt tract was unwilling to sell until the property was closer to the development stage and would therefore command a higher price. Anticipating its need for a new site of operations when the Calverton subdivision would be completed, MCD resumed its attempts to purchase the Belt Tract in 1964. The owner of the Belt tract rejected a number of offers during that year from MCD and other interested developers and instead decided to sell the property by a public solicitation of sealed bids. Shortly before the date for submitting such bids, Turner learned that the county sewer commission was planning to authorize the extension of water and sewer lines into the area of the Calvert and Belt tracts, and this knowledge made him even more intent on acquiring the Belt tract. On April 26, 1965, Turner attended the public meeting for the opening of bids on the Belt tract. He submitted two bids and accompanying cash deposits, *82 one on behalf of his wholly-owned corporation Carrollton Enterprises, Inc., and another higher bid on behalf of MCD. Turner had also been prepared to submit a third and still higher bid and cash deposit on behalf of MCD if he felt that such a bid was necessary to obtain the property. As it turned out, MCD's first bid was accepted as the highest one submitted. On May 20, 1965, MCD executed a contract to purchase the Belt tract, consisting of 574.7667 acres, for $2,615,188.49. MCD agreed to pay $784,556.55 in cash and give its promissory note for the balance of the purchase price, payable within seven years, bearing interest at the rate of 5-1/2 percent, and secured by a first deed of trust on the property. MCD paid for and took title to the Belt tract in November 1966. Turner discussed his plans for the Calvert and Belt tracts with Kilby. They concluded that the two tracts should be combined for the purpose of designing a planned community including various types of housing, apartments, and commercial construction. Such a plan of subdivision and development, encompassing both the Calvert and Belt tracts, could more readily obtain the approval of the county planning commission *83 and the necessary zoning changes than could separate plans for each tract. Turner told Kilby that he was willing to sell the Calvert tract to MCD so that it could do all the residential construction in the planned community, including townhouses and apartment buildings, providing MCD would obtain commercial zoning for a 75-acre portion of the Belt tract and convey it to Turner as part of the consideration for the Calvert tract. The designated 75 acres lay at the intersection of two main roads and therefore seemed to Turner especially suitable for the eventual development of a shopping center or other commercial use. On June 7, 1965, Turner met with his accountants and with his attorney Beatty to discuss the proposed sale of the Calvert tract to MCD. Beatty prepared a draft contract of sale in accordance with Turner's instructions, including a provision that MCD would convey 75 acres of the Belt tract to Turner as part of the consideration for the Calvert tract. Several times during the next few months, Beatty conferred with Turner and his accountants to obtain their comments and approval of the draft he was preparing. On June 21, 1965, Turner applied to the Citizens Bank of Maryland *84 for a loan of $275,000 to be secured by a second deed of trust on the Calvert tract (junior to Turner's purchase money obligation already encumbering the property). In connection with this application, Turner submitted a financial statement to the bank showing that his net worth at the time was more than twelve million dollars. The bank appraised the Calvert tract at $1,900,000. On June 24, 1965, it loaned Turner $275,000 for a term of eighteen months, accruing interest at the rate of six percent payable semi-annually, and secured by a second deed of trust on the Calvert tract, which was recorded on July 2, 1965. Turner needed the loan to pay off other indebtedness of his that was becoming due, to pay real estate taxes on the properties he owned, and to begin development of the Calverton Shopping Center. On June 23, 1965, MCD wrote to the Interstate Building Association of Washington, D.C. (hereinafter Interstate) to request a loan of $1,254,000 to be secured by a first deed of trust on the Calvert tract. MCD represented that it was the contract owner of the Calvert tract for a price of $1,900,000. As part of MCD's formal application for the loan, Interstate required an executed *85 copy of MCD's contract to purchase the Calvert tract. On July 2, 1965, Turner and Kilby went to Beatty's office in order to obtain such a document that could be submitted to Interstate. Beatty was then still in the process of drafting the final agreement of sale between Turner and MCD. Because Beatty was out of town, Turner and Kilby met with Beatty's partner, who was unfamiliar with the work previously done on the matter and was unaware of the proposal that MCD convey 75 acres of the Belt tract to Turner as partial consideration for the Calvert tract. Using a preprinted standard form contract for the sale of real estate in Maryland, the attorney prepared the requested document, which was immediately signed by Turner, as seller, and MCD by its secretary, Kilby, as purchaser. The purported contract of sale recited that Turner agreed to sell the 476.4245 acres of the Calvert tract to MCD for a total price of $1,905,698 ($4,000 per acre). It further recited that MCD had given Turner a deposit of $10,000 toward such price, that MCD would assume Turner's purchase-money obligation still encumbering the property in the amount of $251,552.14 and also assume the second deed of trust in *86 the amount of $275,000 which Turner had given to Citizens Bank, and that MCD would give Turner its unsecured promissory note for the balance of the purchase price, payable on demand and bearing interest at the rate of 5-1/2 percent. The purported contract further provided that settlement was to take place within 30 days. It contained no provision regarding the conveyance to Turner of 75 acres of the Belt tract as partial consideration for the Calvert tract. In fact, MCD did not then give Turner any deposit toward the purchase price of the Calvert tract, and neither party intended the document to reflect their final agreement of sale. The document was prepared and signed only for purpose of submission to Interstate as part of MCD's loan application. Interstate was not concerned with the specific terms of the contract but only wanted documentary evidence that MCD would be able to provide the Calvert tract as security for the proposed loan. On July 28, 1965, MCD submitted to Interstate the formal loan application together with the purported contract of sale prepared and signed on July 2. On August 9, Interstate again appraised the Calvert tract at $1,900,000. The next day Interstate *87 issued its commitment to loan MCD $1,254,000 for a term of three years, bearing interest at the rate of six percent, and secured by a first deed of trust on the Calvert tract. Interstate required that Turner, Kilby, and their wives personally guarantee payment of the loan. On August 30, 1965, Beatty again conferred with Turner's accountants to make final changes in the provisions of the sales agreement regarding MCD's assumption of existing mortgages on the Calvert tract. At this conference Beatty and the accountants made no reference to the purported contract of sale of July 2, 1965, which had been submitted to Interstate. On October 4, 1965, Turner and MCD executed their final agreement of sale for the Calvert tract. In pertinent part, it provided as follows: 1. [Turner] will convey unto [MCD] a fee simple title to the [Calvert] tract * * * * * * consisting of 476.4245 acres * * * subject to a deed of trust and a mortgage, a part of which [MCD] shall assume and pay as the same become due and payable, said deed of trust and mortgage being in amounts as follows: A. Deed of trust from [Turner] * * * securing payment of deferred purchase money for the original purchase *88 of said property * * * dated June 5, 1961, with an unpaid balance of Two Hundred Fifty-one Thousand Five Hundred Fifty-two and 14/100 ($251,552.14) Dollars. B. Mortgage from Albert W. Turner et ux. to Citizens Bank of Maryland dated June [*] , 1965, intended to be recorded prior to the conveyance herein mentioned securing payment of Two Hundred Seventy-five Thousand ($275,000.00) Dollars for money borrowed, payable on or before eighteen months after date, with interest at the rate of six per cent per annum, payable semi-annually. 2. Total purchase price shall be at the rate of Four Thousand ($4,000.00) Dollars per acre for 401.4245 acres, or a total of One Million Six Hundred Five Thousand Six Hundred Ninety-eight ($1,605,698.00) Dollars, and exchange of 75 acres as hereinafter provided. 3. Purchaser shall pay the sum of Ten Thousand ($10,000.00) Dollars in cash at time of settlement. 4. Purchaser shall assume and pay as the same becomes due and payable the same proportion of the above mentioned deed of trust and mortgage as the 401.4245 acres above described bears to the total of said tract, which for the purpose of this Agreement is fixed at Four Hundred Forty-three *89 Thousand Five Hundred Fifty-two ($443,552.00) Dollars, and the Seller hereby guarantees to pay the remainder of said indebtedness totaling Eight-three Thousand ($83,000.00) Dollars. 5. Purchaser shall give unto the Seller an unsecured note for One Million One Hundred Fifty-two Thousand One Hundred Forty-six ($1,152,146.00) Dollars, balance of purchase price, payable on demand, said note to bear interest at the rate of four (4%) per cent per annum, payable annually. 6. That [MCD] shall forthwith apply for reclassification of zoning of such portions of the [Calvert and Belt] tracts * * * as it desires to have zoned for apartments, town houses and/or commercial development, and upon acquiring said zoning [MCD] shall convey unto [Turner] the * * * 75 acres of said rezoned land for [Turner] to retain as the investment planned for his own tract. 7. In the event [MCD] fails to obtain zoning of at least 150 acres for the purposes outlined in the total of the two tracts above described, then [MCD] shall convey unto [Turner] such proportion of the total land rezoned as the present holdings of [Turner] bears to the total holdings of [MCD] after conveyance unto it *90 of the tract owned by [Turner] and for any residue of the 75 acres to be exchanged as above provided [MCD] shall pay [Turner] the sum of Four Thousand ($4,000.00) Dollars per acre, it being the intention of the parties hereto that [Turner] shall receive a minimum of 75 acres rezoned or a proportionate part as above described, in the event purchaser does not obtain at least 150 acres of zoning. 8. Exchange of property above described shall be as soon as final zoning can be determined. 9. Title to the above described property at the time of each conveyance shall be free of all encumbrances except as herein noted and hereinafter set forth, it being understood that the conveyance from [Turner] to [MCD] shall be subject to the total of the deed of trust and mortgage above, described, and that should [MCD] need to refinance or pay off the total indebtedness on said property in order to develop and use the same prior to the time [Turner] shall have paid his Eighty-three Thousand ($83,000.00) Dollar portion of the obligation, then the lien of said indebtedness of Eighty-three Thousand ($83,000.00) Dollars shall be substituted for and upon the 75 acres to be conveyed *91 to [Turner] by [MCD]. On October 14, 1965, the following transactions occurred simultaneously: (1) Interstate loaned MCD $1,254,000 for a term of three years and bearing interest at the rate of six percent payable monthly. Turner, Kilby, and their respective wives personally guaranteed the loan, as required by Interstate. The loans proceeds were applied as follows: To pay off first deed of trust securing Turner's purchase money obligation
$251,552.14
of 6/5/61 and accrued interest to 10/20/65
2,443.98 $253,996.12
To pay off second deed of trust securing Turner's loan from Citizens Bank on 6/24/65
$275,000.00
and accrued interest to 10/20/65
5,448.12 280,448.12
To pay off interest to Interstate on $1,254,000 at 6% for the period 10/14/65 to 10/31/65
3,344.00
To pay misc. closing costs
21,894.40
Balance disbursed to MCD
694,317.36
TOTAL
$1,254,000.00
(2) MCD gave Interstate its promissory note for the loan and a first deed of trust to the Calvert tract. (3) Turner conveyed the Calvert tract to MCD, but MCD did not then convey to Turner the 75-acre portion of the Belt tract. (4) MCD gave Turner the *92 specified cash downpayment of $10,000 and its unsecured promissory note in the amount of $1,152,146.00, payable on demand and bearing interest at the rate of four percent. (5) Turner gave MCD his note in the amount of $83,000, bearing interest at the rate of four percent. MCD used its cash proceeds from the Interstate loan as working capital for the development of its new project, which it named the Kettering subdivision. On January 5, 1966, Turner reimbursed MCD for the payment out of the proceeds of the Interstate loan of the accrued interest to October 20, 1965 on the two debts encumbering the Calvert tract prior to the sale, except for the $83,000 portion of such indebtedness as to which he became directly liable to MCD. Turner made annual payments of interest on account of his $83,000 note to MCD, until he paid in full the principal amount of the note on December 31, 1971. Beginning in July 1965, MCD directed its engineering firm to conduct a boundary and topographic survey of the Calvert and Belt tracts and prepare a preliminary plan of the Kettering subdivision. The plan contemplated a large community of single-family houses, townhouses, garden apartments, high-rise *93 apartments, and commercial buildings. MCD applied to the county commissioners of Prince Georges County for the necessary zoning changes, including commercial zoning for the designated 75 acres of the Belt tract, and submitted the plan of subdivision to the county planning commission for its approval prior to development. MCD also applied to the county sewer commission for the extension of water and sewer lines to service its property. The commission authorized the extension on September 22, 1966, and MCD subsequently made the required cash escrow deposits and contributions toward the commission's construction costs. In December of the same year, the county planning commission granted its final approval of the Kettering subdivision plan and MCD then began the residential development of the subdivision. It later made the following purchases of land from unrelated sellers in order to expand the area of the subdivision: Date
Acreage
Purchase Price 7/27/66
187.7710
$ 704,141.25
1968
363.3610
1,274,303.00
1968
105.4740
317,550.00
On August 23, 1967, the county commissioners granted MCD's application for commercial zoning of the designated 75-acre *94 portion of the Belt tract. In accordance with its obligation under the contract of October 4, 1965, MCD conveyed this 75 acres to Turner on October 13, 1967. He retained it for the eventual construction of a shopping center or other commercial use. In his Federal income tax return for 1965, Turner characterized his gain from the sale of the Calvert tract as a long-term capital gain and elected to report such gain on the installment method, according to the following computation: Sale of 401.4245 acres of the Calvert tract
$1,605,698
Less: Adjusted basis (proportionate part of $528,151 adjusted basis of all 476.4245 acres of the Calvert tract)
445,151
Gross profit
$1,160,547
Selling price
$1,605,698
Less: Mortgages assumed by purchaser
443,552
Contract price
$1,162,146
Gross profit ratio:
Gross profit / Contract price = $1,160,547 / $1,162,146 = 99.862%
Payments in year of sale (1965
$ 10,000
Gross profit ratio
.99862
Gain reported in 1965
$ 9,986
Turner's computation conformed to the terms of the contract of sale which he and MCD executed on October 4, 1965 and closed on October 14, 1965 (subject to the later conveyance *95 of 75 commercially-zoned acres of the Belt tract). The computation also reflected Turner's position that the exchange of 75 acres of the Calvert tract for 75 acres of the Belt tract qualifies for nonrecognition of gain under section 1031, Internal Revenue Code of 1954. In the notice of deficiency to Turner, respondent determined that Turner's gain from the sale of the Calvert tract was taxable as ordinary income because Turner held such property for sale to customers in the ordinary course of his trade or business. The notice of deficiency contained no other objection to Turner's reporting of the transaction. In an amendment to his answer herein, respondent alleges that the purported contract which Turner and MCD signed on July 2, 1965 expresses the true terms of their bargain with respect to the Calvert tract and, therefore, Turner's gain on the sale of the Calvert tract must be reported in accordance with those terms, i.e., a sale of 476.4245 acres at $4,000 per acre. The amended answer further alleges that MCD's assumption of Turner's $275,000 mortgage to Citizens Bank must be regarded as an additional payment which Turner received in the year of *96 the sale. Respondent incorporates these allegations in the following computation he makes of the gain includable in Turner's gross income for the year of the sale: Sale of 476.4245 acres of the Calvert tract
$1,905,698.00
Less: Adjusted basis
528,151.00
Gross Profit
$1,377,547.00
Selling price
$1,905,698.00
Less: Mortgage assumed by purchaser
251,552.00
Contract price
$1,654,146.00
Gross profit ratio:
Gross profit / Contract price = $1,377,547 / $1,654,146 = 83.2784%
Payments in year of sale (1965)
Cash - Direct $ 10,000
Cash - Indirect thru assumption of contemporaneous loan 275,000 $ 285,000.00
Gross profit ratio
.832784
Gain to be recognized in 1965
$ 237,343.44
Shareholder Advances Shareholder Advances When Turner and Kilby organized MCD on September 20, 1949, with a capital contribution of $10,000 each, they anticipated that the corporation would require additional funds from them in order to develop the Hollywood subdivision. On October 6, 1949, the board of directors of MCD authorized the corporation to borrow [8] from Turner and Kilby such additional working capital as it needed in return for the corporation's *97 unsecured, non-interest-bearing promissory notes payable within one year or less. During its first fiscal year ended September 30, 1950, MCD borrowed the following amounts from Turner and Kilby and made the following repayments: Turner
Kilby
Date
Loans (Repayments)
Balance
Loans (Repayments)
Balance 10/8/49
$5,000
$ 5,000
11/6/49
5,000
10,000
$5,000
$ 5,000
11/21/49
5,000
15,000
5,000
10,000
1/31/50
5,000
20,000
2/23/50
5,000
25,000
3/2/50
5,000
30,000
3/28/50
5,000
35,000
4/8/50
(10,000)
25,000
4/28/50
( 5,000)
20,000
5/8/50
5,000
25,000
5/21/50
5,000
30,000
9/30/50
10,000
40,000
10,000
On December 27, 1950, MCD gave Kilby its unsecured, non-interest-bearing promissory note in the amount of $10,000, payable within one year, in order to renew its outstanding indebtedness to Kilby which was then past due. On January 2, 1951, MCD borrowed $19,000 each from Turner and Kilby in return for its *98 unsecured, non-interest-bearing promissory notes, payable within one year and bearing interest at the rate of six percent payable at maturity. MCD needed the additional funds to proceed with the development of the Hollywood subdivision. On February 9, 1951, MCD renewed for another term of one year its non-interest-bearing notes to Turner, each in the amount of $5,000 and originally executed on January 31, 1950 and February 14, 1950. On April 2, 1951, the board of directors of MCD discussed the fact that two of the corporation's notes to Turner in the amount of $5,000 each had fallen due on March 1 and March 10, 1950 and two other notes in the same amount would fall due on April 8 and April 21, 1951. The board concluded that MCD needed to retain the borrowed funds for its operations and that the notes to Turner should therefore be extended for additional terms of one year. MCD issued its non-interest-bearing renewal notes for the past due notes and later did the same with respect to the two other notes as they fell due. On June 11, 1951, MCD obtained an unsecured construction loan from Suburban Trust Company of Hyattsville, Maryland. Because the corporation was still *99 short of funds for its construction operations, it borrowed an additional $10,000 each from Turner and Kilby and gave them its unsecured promissory notes in that amount, payable within one year and bearing interest at the rate of five percent payable at maturity. On September 17, 1951, MCD obtained from a local mortgage lender another construction loan of $279,300, secured by lots in the Hollywood subdivision and bearing five percent interest. During its fiscal year ended September 30, 1951, MCD borrowed the following amounts from Turner and Kilby and made the following repayments: Turner
Kilby
Date
Loans (Repayments)
Balance
Loans (Repayments)
Balance 1/21/51
$19,000
$59,000
$19,000
$29,000
4/6/51
( 1,000)
28,000
6/11/51
10,000
69,000
10,000
38,000
6/30/51
(30,000)
39,000
9/30/51
39,000
38,000
On October 2, 1951, MCD consolidated its four outstanding On October 2, 1951, MCD consolidated its four outstanding notes to Turner and Kilby. The notes of January 21, 1951, and June 11, 1951, which Turner held, were consolidated into one note in the amount of $29,000, payable within one year *100 and bearing interest at the rate of five percent, payable at maturity. After taking into account the $1,000 repayment on April 6, 1951, the notes of the same dates held by Kilby were consolidated into one note in the amount of $28,000, payable within one year and bearing interest at the rate of five percent, payable at maturity. MCD did not make any payments to Turner or Kilby on account of the interest accrued on the old notes. During its fiscal years ended September 30, 1952 through 1959, MCD borrowed the following amounts from Turner and Kilby and made the following repayments: Turner
Kilby
Date
Loans (Repayments)
Balance
Loans (Repayments)
Balance 10/31/51
$ 5,000
$44,000
$ 6,000
$44,000
12/31/51
( 1,000)
43,000
( 1,000)
43,000
1/14/52
( 1,000)
42,000
( 1,000)
42,000
2/7/52
( 1,000)
41,000
3/10/52
3,000
45,000
3,000
44,000
9/8/52
(25,000)
20,000
(25,000) 19,000
9/13/52
10,000
30,000
6,000
25,000
9/30/52
6,000
36,000
10,000
35,000
4/24/53
25,000
61,000
25,000
60,000
4/30/53
6,000
67,000
6,000
66,000
1/8/53
( 6,000)
61,000
( 6,000)
60,000
10/1/53
( 2,000)
59,000
( 1,000)
59,000
9/30/54
59,000
59,000
9/30/55
59,000
59,000
9/30/56
15,0 00
74,000
59,000
12/10/56
(15,000)
59,000
59,000
4/30/57
(10,000)
49,000
(10,000)
49,000
6/30/57
(10,000)
39,000
(10,000)
39,000
9/30/57
( 4,000)
35,000
( 4,000)
35,000
9/30/58
35,000
35,000
5/31/59
5,000
40,000
5,000
40,000
9/30/59
40,000
( 2,000)
38,000
*101 Until October 30, 1957, MCD's outstanding indebtedness to Turner and Kilby was evidenced by MCD's current, unsecured notes payable within one year, some non-interest-bearing and some bearing five percent interest payable at maturity. Until that date, each note was extended for additional terms of one year whenever it became due, but the only payments of accrued interest made on account of the notes were payments of $2,693.71 to Turner and $2,589.71 to Kilby on October 1, 1953. The latest two notes evidencing the corporation's indebtedness to Turner and Kilby were issued on September 30, 1957 and were not extended when they matured, although the principal amounts remained unpaid. During these years, MCD made timely payments of principal and interest on account of the many construction loans which it obtained from various local banks and lending institutions. These loans were generally secured by deeds of trust to MCD's land in the Carrollton subdivision and bore interest at the rate of five percent. In 1956, Kilby incurred a debt of $20,000 to MCD for the construction of his house. This debt was not credited against the corporation's indebtedness to Kilby but was carried *102 on the corporation's books as a separate account receivable from Kilby bearing interest at the rate of 5 percent. On December 16, 1958, and January 30, 1959, Turner and Kilby consented to having their outstanding loans to MCD subordinated to two construction loans which the corporation obtained from Citizens Bank in the respective amounts of $970,000 and $970,800, both of which were secured by deeds of trust to land in the Carrollton subdivision. From October 1, 1959 until January 31, 1962, Turner and Kilby made loans to MCD in the following amounts and MCD made the the following repayments: [9]
*103 Turner
Kilby
Date
Loans (Repayments)
Balance
Loans (Repayments)
Balance 4/30/60
($ 5,000)
$35,000
($ 5,000)
$33,000
9/30/60
5,000
40,000
5,000
38,000
12/31/60
( 7,500
32,500
( 7,500)
30,500
1/31/62
( 32,500)
-0-
( 30,500)
-0-
MCD did not declare or pay any dividends from the date of its incorporation through January 31, 1962. On the balance sheets appearing in its Federal income tax returns for its fiscal years ended September 30, 1961 and 1962, MCD reported earned surpluses of $716,855.08 and $771,740.32 as of the close of each year. The following table represents a summary of the outstanding liabilities and equity of MCD as of the dates indicated and as shown on its tax returns: Date
Liabilities
Equity
Ratio 9/30/50
$ 762,161.09
$ 81,572.78
9:1
9/30/51
1,106,408.98
136,296.65
8:1
9/30/52
882,873.85
163,856.85
5:1
9/30/53
646,663.81
116,364.03
6:1
9/30/5 4
897,213.40
102,983.73
9:1
9/30/55
1,412,893.82
200,093.31
7:1
9/30/56
1,794,285.76
218,221.76
8:1
9/30/57
1, 894,092.52
268,525.35
7:1
9/30/58
3,001,642.15
432,142.85
7:1
9/30/59
4,80 8,918.69
611,547.85
8:1
9/30/60
10,349,683.03
657,297.93
17:1
9/30/61
13,675,731.13
736,855.08
18:1
9/30/62
13,693,557.19
791,740.32
17:1
*104 Respondent determined that MCD's payments of $32,500 to Turner and $30,500 to Kilby on January 31, 1962 constituted taxable dividends to them rather than nontaxable repayments of their loans to the corporation. ULTIMATE FINDINGS OF FACT Petitioner Albert W. Turner held the property constituting the Hollywood subdivision and the ground leases of such property, to the extent that the same are involved herein, for sale to customers in the ordinary course of his trade or business. Petitioner Albert W. Turner held the property constituting the Carrollton subdivision, to the extent that it is involved herein, primarily for sale to customers in the ordinary course of his trade or business. Petitioner Albert W. Turner held the property constituting the Calvert tract, to the extent that it is involved herein (including the 75 acres exchanged as partial consideration for the Belt tract), primarily for sale to customers in the ordinary course of his trade or business. The payments by MCD in 1962 to petitioners Albert W. Turner and Herndon G. Kilby were not repayments of any bona fide indebtedness of MCD but were a distribution of earnings and profits by way of dividends. OPINION
*105 1. Ordinary Income or Capital Gain The first issue is whether petitioner Albert W. Turner's gains from the sale of certain real estate are taxable as ordinary income or long-term capital gains. [10]Section 1221(1)[11] denies capital gain treatment to gains arising from the sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The purpose of this statutory provision, the Supreme Court said in a well-known case involving the characterization of gain from the sale of real estate, "is to differentiate between "the profits and losses arising from the everyday operation of a business' on the one hand * * * and "the realization of appreciation in value accrued over a substantial period of time" on the other. * * *" Malat v. Riddel, 383 U.S. 569, 572 (1966). [Citations omitted.] *106 The supposed dichotomy can sometimes be elusive and therefore remains a chronic subject of litigation. In the recent case of Robert L. Adam, 60 T.C. 996, 999 (1973), we reiterated the criteria most frequently employed by the courts to distinguish between profits arising from the liquidation of an "investment" in real estate and those from the "business" of selling real estate: (1) the purpose for which the property was acquired; (2) the frequency, continuity, and size of sales; (3) the activities of the seller in the improvement and disposition of the property; (4) the extent of improvements made to the property; (5) the proximity of sale to purchase; and (6) the purpose for which the property was held at the time of the sale. Robert W. Pointer, 48 T.C. 906, 915-916 (1967), affd. 419 F.2d 213 (C.A. 9, 1969); Raymond Bauschard, 31 T.C. 910, 916 (1959), affd. 279 F.2d 115 (C.A. 6, 1960); Walter H. Kaltreider, 28 T.C. 121, 124 (1957), affd. 255 F.2d 833 (C.A. 3, 1958). The ultimate determination *107 is a factual one and "[the] totality of circumstances is of course controlling in each case." (Emphasis added.) Brown v. Commissioner, 448 F.2d 514, 516 (C.A. 10, 1971), affirming 54 T.C. 1475 (1970). The burden of proof is on the petitioners. Welch v. Helvering 290 U.S. 111 (1933), Rule 142, Rules of Practice and Procedure of this Court. The parties do not dispute the governing legal principles, but disagree sharply over their application herein. Turner portrays himself as a passive investor in real estate whose gains arose from long-term appreciation in value due to external causes such as the advent of water and sewer lines and the movement of population toward the properties he held. He urges us to distinguish carefully between his alleged passivity as an individual owner of real estate and his activities as president of MCD. Conversely, respondent portrays Turner as a joint participant with MCD in the business of residential real estate development. In respondent's view, Turner was continuously engaged in finding and purchasing raw land suitable for residental development, obtaining water and sewer lines to service such property, *108 subdividing it into building lots, and then selling it to MCD for the final construction work and marketing to the public. Our examination of the voluminous record in this case, covering over fifteen years of real estate dealings between Turner and MCD, convinces us that respondent's description of the situation is closer to the mark. Applying the criteria enumerated in the Adam case, supra, to the facts of the instant case, we conclude that Turner held all of the properties in question primarily for sale to customers in the ordinary course of his business. While the facts varied somewhat in regard to each individual property, the pattern was basically the same and we do not consider the variations sufficient to cause us to reach differing results as to some properties. Turner purchased unimproved acreage which he thought would be suitable for residential construction as soon as the necessary preliminary development work was completed. He then generally completed such preliminary development activities in his individual capacity, procuring water and sewer line extensions to service the property, preparing a plan of subdivision, and obtaining the necessary approval of the county *109 authorities prior to the start of construction. When these activities were completed, Turner would then usually sell the subdivided land to MCD for the final construction work and marketing to the public. In short, Turner's activities with respect to the properties were essentially the same as those he carried on when he was engaged as a sole proprietor in the business of building and selling houses; once MCD was incorporated, however, Turner confined his activities to the preconstruction stage and let MCD carry on from there. The profits from the construction business were shared with Kilby, who continued as construction manager of the planned developments and was the other principal shareholder of MCD. We are further supported in the conclusion that Turner was engaged in the business of buying and selling real estate by numerous cases involving similar dealings in real estate between a controlling shareholder and his corporation engaged in the business of building and selling houses. Tibbals v. United States, 362 F.2d 266, 268-272 (Ct. Cl. 1966); Browne v. United States, 356 F.2d 546 (Ct. Cl. 1966); Burgher v. Campbell, 244 F.2d 863 *110 (C.A. 5, 1957); Robert A. Boyer, 58 T.C. 316, 323-326 (1972); Royce W. Brown, 54 T.C. 1475 (1970), affd. 448 F.2d 514 (C.A. 10, 1971); August Engasser, 28 T.C. 1173 (1957); Walter H. Kaltreider, supra. While some of these cases speak broadly of imputing the corporation's activities to the vendor-shareholder, we think it unnecessary to go that far in the instant case. Here the taxpayer's own frequent and substantial purchases and sales of real estate, coupled with his own substantial development activities with respect to most of the properties in question, are sufficient in themselves to put him in the business of buying and selling real estate and warrant ordinary income treatment of the gains arising from such sales. Compare Royce W. Brown, supra, 54 T.C. at 1488; August Engasser, supra, 28 T.C. at 1177. Moreover, a supplier of developable land may be regarded as a joint participant with the builder in an integrated real estate development business even though the two are otherwise unrelated *111 entities. See Robert W. Pointer, supra, 48 T.C. at 917, affd. 419 F.2d 213, 216; Raymond Bauschard, supra, 31 T.C. at 916-917, affd. 279 F.2d 115, 118. Overall, we are left with a picture of an individual whose personal services had a direct and substantial influence on the value of the properties he sold. In his individual capacity, Turner actively promoted the development of the residential communities at Hollywood, Carrollton, and Kettering, in the first instance by buying a group of contiguous properties to create locational values that did not exist previously and then by performing various necessary preliminaries to the actual construction of homes on the assembled property. Turner's attempt to utilize Kilby's 49 percent ownership as a "safety valve" by which his activities and those of MCD can be compartmentalized and kept separate from each other must fail under the circumstances herein. We are convinced that Turner was the "moving force" in the development activities which took place (see Tibbals v. United States, supra, 362 F.2d at 266) and that Kilby's so-called veto power never realistically existed *112 (Cf. Robert A. Boyer, supra, 58 T.C. at 325). [12]
Having determined from an overview of Turner's activities that he was generally engaged in the business of buying and selling real estate, we turn now to a consideration of his arguments in regard to the specific properties involved herein, recognizing that a portion of a taxpayer's holdings of a certain type of property may be held for investment while the remaining portion may be held for sale within the meaning of section 1221(1). See e.g., Maddux Construction Co., 54 T.C. 1278, 1286 (1970). Turner's first line of defense in regard to his sales of property in the Hollywood subdivision is that such property was originally purchased and thereafter held primarily for the collection of rental income from ground leases of such property.We have previously indicated our finding that Turner acquired each property for ultimate residential development and sale. Turner regarded the ground lease *113 arrangement as the form of financing which seemed most suitable under the prevailing circumstances for promoting the sale of houses on the Hollywood subdivision. Turner's willingness to set the ground rents he charged at a level below the then prevailing rate of return on such investments and his apparent acquiescence in redemption of some of the ground rents during the specified five-year no-redemption period are inconsistent with his professed purpose of holding the property primarily for rental income. [13]
Turner also argues that the ground-rented lots could not have been held primarily for sale because redemptions were at the option of the lessee and could not be compelled by the lessor. See Commissioner v. Simmers' Estate, 231 F.2d 909, 915 (C.A. 4, 1956), *114 affirming 23 T.C. 869, 877-878 (1955). We think the argument is unavailing. The ground rents were not created independently of the sale of the appurtenant houses by MCD, but for the primary purpose of facilitating those sales and as an incident thereof. [14] Indeed, the existence of an option to buy on the part of the lessee through the absolute right of redemption, while far from determinative, is an element to be weighed in balancing all the factors involved in Turner's position vis-a-vis the ground leases. See Joseph A. Harrah, 30 T.C. 1236, 1241 (1958). *115 That Turner held the ground leases primarily for sale and not for the collection of rental income is underscored by the fact that he decided in 1951 to sell most of the remaining Hollywood lots to MCD for resale by MCD to individual purchasers of houses as soon as it appeared to him that the ground lease arrangement was no longer the most expedient means of marketing the Hollywood subdivision to the public. It is also appropriate to note at this point the evidence in the record that Turner agreed to the reduction of the ground rents during the first five years of each lease only after he ascertained that the local law would not require a corresponding reduction in the redemption price of the lots. We also note that in the context of this case, the fact that the ground leases were not per se advertised or offered for sale by Turner is of minimal significance. In sum, we are convinced, that Turner looked for his profits to the ultimate redemptions of the lots rather than the ground rents he would receive prior to redemption. [15]
*116 We regard Turner's sale of 119 Hollywood lots to MCD in 1951 (after allowance for the 58 lots returned in the next year) and his various sales of land in the Carrollton subdivision to MCD as proto-typical examples of his course of conduct in buying real estate, preparing it for residential development, and selling it to his related corporation for the final construction work. Turner's only specific argument in support of his position that these sales should be regarded as simply the liquidation of an investment is that the sales were made "in bulk" rather than lot-by-lot to individual customers. We have previously rejected this argument as insufficient to take property out of the category of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Donald J. Lawrie, 36 T.C. 1117, 1121 (1961). The record is vague in regard to Turner's specific purpose for holding the three unimproved lots in the Hollywood subdivision which he sold in 1963. Turner testified that MCD was unable to build on those lots because of a defective subsoil condition. We think such evidence in itself is insufficient, however, to establish *117 any distinction between Turner's purpose for holding the three lots and his purpose for holding the other lots in the Hollywood subdivision which he also sold. In the case of each such lot the gain on the sale was partly attributable to Turner's extensive personal activities to promote the subdivision and thereby enhance the value of the land. Thompson v. Commissioner, 322 F.2d 122, 127-128, affirming on this issue 38 T.C. 153, 165 (1962). Turner's activities in his individual capacity were considerably less in connection with the Calbert tract of the Kettering subdivision that those he undertook in connection with the earlier subdivisions, such as subdividing the assembled property, obtaining extensions of county water and sewer lines to the property, and preparing the plan of development. We are satisfied, however, that this reduction in Turner's individual development activities was attributable not to any decision on his part to withdraw from the business of buying and selling real estate but to external circumstances which were not present in the earlier situation. As in the case of the earlier subdivisions, Turner originally intended to combine *118 a number of contiguous parcels of raw land into a site suitable for residential development. He was able to purchase the Calvert tract in 1961 but was unsuccessful in his attempts to acquire the adjacent Belt tract. MCD was finally able to purchase the Belt tract in 1965 at a higher cost than originally anticipated by Turner and by beating a lower bid submitted by Turner's wholly-owned corporation.Because it seemed that the necessary zoning changes and official approval of the development plan could be more readily obtained if the Calvert and Belt tracts were combined at the outset, Turner sold the latter tract to MCD prior to his usual preliminary development activity. [16] We do not think it possible under these circumstances to distinguish between Turner's purpose with respect to the Hollywood and Carrollton tracts and the Calvert tract - in each case he held the land primarily for sale in the ordinary course of a real estate development business in which he was jointly engaged with MCD. *119 Finally, we think this case is clearly distinguishable from the case most heavily relied upon by Turner, Ralph E. Gordy, 36 T.C. 855 (1961). In that case, we held that the taxpayer's isolated sales of land of his controlled corporation engaged in the real estate development business, where the taxpayer engaged in no development activity with respect to the property sold, resulted in capital gains. This is a far cry from the instant situation, where Turner made continuous and frequent sales to his corporation, engaged in substantial development activities with respect to the properties sold, and purchased similar land to replenish his holdings. See Brown v. Commissioner, supra, 448 F.2d at 517-518 affirming 54 T.C. at 1490; Browne v. United States, supra, 356 F.2d at 547. Based on the "totality of circumstances" involved herein and keeping in mind that petitioners have the burden of proof (see p. 59 supra ), we hold that all of the gains in issue are taxable to Turner as ordinary income.
2. Total Contract Price, Gross Profit, and Payments in Year of Sale Next for determination are the amounts of the total contract price, *120 gross profit, and payments in the year of sale (as those terms are defined in section 453 and the regulations thereunder) arising from Turner's sale of the Calvert tract to MCD on the installment method. The positions of the parties are somewhat confusing due to the overlapping relationships between various elements of the transaction but, as best we can determine, these positions seem to be as follows: (1) Turner, on his tax return and in this preceeding, takes the position that the transactions were consummated pursuant to the October 4, 1965 contract between himself and MCD and that that contract effectuated two separate transactions: (a) a sale of 401.4245 acres of the Calvert tract having a cost basis of $445,151 at $4,000 per acre, or a selling price of $1,605,698, against payment of $10,000 cash, an assumption by MCD of $443,552 of mortgage, [17] and a deferred payment of $1,152,146 in the form of an unsecured demand promissory note, thus creating a gross profit of $1,160,547, a contract price of $1,162,146, and a profit ratio of .99862, and (b) an exchange of 75 acres of the Calvert tract for 75 acres of the Belt tract. *121 (2) Respondent takes the position that the document which is the proper foundation for determining the tax consequences of the Calvert tract transaction is the purported contract of July 2, 1965 between Turner and MCD with the result that there was a single transaction involving the sale by Turner to MCD of 476.4245 acres at $4,000 per acre or a total selling price of $1,905,698, the cost basis of which to Turner was $528,151, resulting in a gross profit of $1,377,547, that the $275,000 second mortgage was a sham so that only the first mortgage of $251,552 should be deducted in determining the contract price, producing a contract price of $1,654,146 and a profit ratio of .832784. Respondent, consistent with his contention that the $275,000 second mortgage was a sham, treats Turner as having received $285,000 of payments in the year of sale, consisting of the proceeds of the second mortgage plus the $10,000 down payment. [18]
*122 Since respondent's position was first taken in an amended answer and results in a claim for an increased deficiency against the Turners for the taxable year 1965, the burden of proof is on him. Rule 142(a), Rules of Practice and Procedure of this Court. Respondent's contention that the purported contract of July 2, 1965 embodies the true agreement between Turner and MCD in regard to the sale of the Calvert tract finds no support in the record. Neither Turner nor MCD intended the document which they signed on that date to reflect their final agreement. They both understood that the document was prepared only for purposes of submission to Interstate in connection with MCD's mortgage loan application, so that Interstate would have the necessary documentary evidence that MCD was in a position to offer the Calvert tract as security for the loan. If there could be any remaining doubts as to the status of the purported contract of July 2, 1965, one need only consider the fact that Turner and MCD made no further reference to such document but consummated the transaction between them in accordance with the terms of the contract they executed on October 4, 1965. The computation of the *123 total contract price, gross profit, and payments in the year of sale arising from the transaction must be made in accordance with the actual bargain of the parties, as reflected in their final agreement of October 4, 1965. Cf. Lewis M. Ludlow, 36 T.C. 102 (1961). But such a generalization does not dispose of the matter and we accordingly turn our attention to certain subsidiary issues between the parties which must be resolved. We deal first with respondent's contention that MCD's assumption of Turner's $275,000 mortgage loan from Citizens' Bank must be included as part of the total contract price for the sale of the Calvert tract and as a payment which Turner received in the year of the sale. Section 1.453-4(c), Income Tax Regs., provides: (c) Determination of "selling price". In the sale of mortgaged property the amount of the mortgage, whether the property is merely taken subject to the mortgage or whether the mortgage is assumed by the purchaser, shall, for the purpose of determining whether a sale is on the installment plan, be included *124 as a part of the "selling price"; and for the purpose of determining the payments and the total contract price as those terms are used in section 453, and sections 1.453-1 through 1.453-7, the amount of such mortgage shall be included only to the extent that it exceeds the basis of the property. * * * Respondent does not argue that Turner's basis in the Calvert acreage which was sold to MCD was less than the mortgages encumbering such property at the time of the sale (see p. 46, supra ) (see Walter Kirschenmann, 57 T.C. 524 (1972), reversed on another issue, 488 F.2d 270 (C.A. 9, 1973)) but contends that the above quoted regulation is inapplicable herein because Turner never intended to repay the $275,000 mortgage loan and that MCD's subsequent assumption of that mortgage was prearranged prior to the time such mortgage was executed. Respondent made a similar argument in Denco Lumber Co., 39 T.C. 8 (1962). The taxpayers there were engaged in the business of building and selling houses. They obtained first mortgage loans on the houses which they built and then sold the houses to individual customers subject to such mortgages, which the *125 purchasers assumed. Respondent took the position that the amount of the mortgage loan on each house was to be included as a payment in the year of sale when the taxpayers reported such sales on the installment method. We held in favor of the taxpayers, relying on section 1.453-4(c). We think that Denco Lumber is controlling herein. We see no reason why Turner should not be entitled to the benefit of respondent's regulation, which appears plainly to apply herein so as to exclude all of MCD's mortgage assumptions from the amount of payments Turner received in the year of sale for purposes of installment reporting. Respondent asserts that the $275,000 mortgage loan executed by Turner and its subsequent assumption by MCD were somehow illegitimate and sham. The record fails to support such a characterization. Citizens' Bank fully investigated Turner's credit worthiness prior to the extension of the loan and looked to him for repayment. There was a gap of over three months between the placing of the mortgage and the contract between Turner and MCD and the closing thereof. Turner paid the interest accruing on such loan prior to its assumption by MCD. We think that, under all the *126 circumstances herein, the $275,000 second mortgage had economic reality [19] and should be dealt with in accordance with respondent's regulation, with the result that Turner should be deemed to have received only $10,000 in the year of sale (1965). We are still left with the question whether the October 4, 1965 contract provided for one transaction, as respondent contends, or two transactions, as petitioners contend. Paragraph 1 of that contract provides for the conveyance by Turner to MCD of 476.4245 acres. See p. 37, supra. Paragraph 2 provides for a purchase price of $1,605,698 and 75 acres of land. [20] See p. 37, supra. Upon this basis and upon the basis of all the pertinent evidence herein, we conclude that MCD and Turner contemplated a single transaction and that, to this extent, respondent's position should *127 be sustained. As a result, the selling price is $1,905,698, Turner's cost basis is $528,151, the gross profit is $1,377,547, the total contract price is $1,462,146 (the selling price less the amount of the mortgages assumed), [21] and the profit ratio is 94.214 for purposes of computing the gain to be recognized under section 453. In respect of the 75 acres of the Belt tract, we note that, in view of our conclusion that the 75 acres of the Calvert tract in exchange were held by Turner "primarily for sale to customers in the ordinary course of his trade or business" (See pp. 69-71, supra ), section 1031 by its terms does not apply and the gain represented by the receipt of that acreage will be taxable as ordinary income. [22]
*128 Finally, we note that our conclusions in the various issues involved in the installment reporting by Turner have been reached on the basis of the record as a whole and without regard to the fact that the burden of proof on these issues was on the respondent. See p. 74, supra. 3. Dividends or Loan Repayments The final issue for decision is whether MCD's payments in 1962 of $32,500 to Turner and $30,500 to Kilby were taxable dividends or nontaxable repayments of their loans to MCD. The answer to this question turns on whether a true debtor-creditor relationship existed between them and MCD with respect to the purported loans or whether such loans were in fact additional capital contributions. This is a question of fact to be determined under all the circumstances. Gooding Amusement Co., 23 T.C. 408, 421 (1954), affd. 236 F.2d 159 (C.A. 6, 1956); Edwin C. Hollenbeck, 50 T.C. 740, 747 (1968), affd. 422 F.2d 2 (C.A. 9, 1970). The burden of proof on this issue is on petitioner. See e.g. Charter Wire, Inc. v. United States, 309 F.2d 878, 880 (C.A. 7, 1962). The record herein persuades us that Turner *129 and Kilby evinced a casual attitude toward repayment of their purported loans to MCD and an intention to leave the funds at the risk of MCD's business until their withdrawal was convenient. [23] Without any intention to indicate that our enumeration is exclusive or establishes any standard of priority or weight, we have taken into account the following factors in reaching this factual conclusion: MCD's almost complete failure to pay the stated interest on the purported loans (see, e.g., Austin Village, Inc. v. United States, 432 F.2d 741, 745 (C.A. 6, 1970), and O.H. Kruse Grain & Milling v. Commissioner, 279 F.2d 123, 126 (C.A. 9, 1960), affirming T.C. Memo. 1959-110); the substantial proportionality of the advances by Turner and Kilby (see, e.g., Charter Wire, Inc. v. United States, supra, 309 F.2d at 880; 2554-58 Creston Corp., 40 T.C. 932, 936 (1963); the voluntary subordination of the loans to the loans of outside creditors (see, e.g., Austin Village, Inc. v. United States, supra, 432 F.2d at 745; Charter Wire, Inc. v. United States, supra, 309 F.2d at 881; O.H. Kruse Grain & Milling Co. v. Commissioner, supra, 279 F.2d at 125-126)); *130 the corporation's usual practice of punctually repaying the principal and interest of loans from outside creditors while failing to do the same with respect to shareholder advances (see, e.g., Austin Village, Inc. v. United States, supra, 432 F.2d at 745; O.H. Kruse Grain & Milling Co. v. Commissioner, supra, 279 F.2d at 126; Gooding Amusement Co. v. Commissioner, 236 F.2d 159, 163 (C.A. 6, 1956)); the corporation's repeated renewal of the shareholders' notes at or after their maturity and, during the last several years prior to the payments in issue, a failure even to stand by the form of renewing such past due notes (see Berkowitz v. United States, 411 F.2d 818, 821; Charter Wire, Inc. v. United States, supra, 309 F.2d 880-881; Gooding Amusement Co. v. Commission, supra 236 F.2d at 163)); and the relatively high ratio of debt to equity, [24] especially in the later years - a factor which, although often considered of minimal importance, takes on added significance when subordination exists (see Tyler v. Tomlinson, 414 F.2d 844, 848 (C.A. 5, 1969)). Given all of the foregoing circumstances, we *131 attach little to the fact that the payments involved herein eliminated the balances purportedly owing to Turner and Kilby. Accordingly, we hold that the payments by MCD to Turner and Kilby in 1962 are taxable to them as dividends. Decisions will be entered under Rule 155. Footnotes
1. The case of the following petitioners is consolidated herewith: Herndon G. Kilby and Margaret M. Kilby, docket No. 1902-70. ↩
2. In an amendment to his answer in docket No. 1904-70, respondent alleged an increased deficiency for 1965 in the total amount of $177,998.34. ↩
3. Margaret L. Kilby is a party to this proceeding solely by reason of having joined in such returns with her husband. ↩
4. Turner's wife joined in all of his real estate conveyances, including the recordation of subdivision plats. Thus technically all real estate transactions involved herein were entered into by both Turners. However, since there appears to be no basis for distinguishing between the Turners, we have for convenience treated such transactions as having been carried out by Albert W. Turner. ↩
5. There is some indication in the record that Turner continued to accept the reduced rents after the expiration of the five-year no-redemption period specified in the rent reduction agreements. It also may be noted from the table above that some redemptions must have occurred within the no-redemption period of each lease. ↩
6. There is some confusion in the record as to whether 3 or 4 lots were involved but any such discrepancy has no bearing on the outcome of the issue before us. ↩
7. The parties agree that the appropriate gross profit ratios for purposes of installment reporting are 84.279 percent with respect to the sale of 35.36 acres on October 12, 1959, 83.6 percent with respect to the sale of 38.60 acres on March 14, 1958, and 83.6 percent with respect to the sale of 20.5724 acres on November 11, 1958. ↩
8. In this portion of our findings, we simply repeat the terminology of debt employed by MCD and its shareholders, without implying thereby any prejudgment of the issue before us. ↩
9. The parties have stipulated to a schedule showing the amounts of Turner's and Kilby's purported loans to MCD and MCD's purported repayments from the date of its incorporation through January 31, 1962. The record also contains a ledger sheet for MCD's account entitled "Notes Payable - Stockholders," and the parties have further stipulated that this ledger sheet should be deemed controlling in the event of any discrepancies between it and the stipulated schedule of loans and repayments. In their briefs, the parties have not pointed out any such discrepancies, perhaps from an understandable reluctance to return to the cryptic notations of the ledger sheet after what we presume was their joint efforts in preparing the stipulated schedule. A particular discrepancy which we noted and which would affect the balance of the shareholder loan account as of January 31, 1962, is a notation (appearing only in the ledger sheet) that MCD made repayments of $5,000 each to Turner and Kilby on December 31, 1959. Because it will not affect the result we reach, we will follow the lead of the parties in disregarding these apparent repayments and have therefore omitted any reference to them in our findings. ↩
10. Respondent disputes the character of Turner's gains from the following sales during the years in issue and from the following installment payments he received during those years on account of sales in earlier years: Hollywood subdivision: (1) redemption of 22 ground rented lots in 1962, 36 in 1963, 20 in 1964, and 13 in 1965; (2) installment payment in 1964 arising from the sale of 119 lots in 1951; (3) sale of 3 lots in 1963; Carrollton subdivision: (4) installment payment in 1962 arising from sale of 35.36 acres in 1959; (5) installment payment in 1963 arising from sale of 38.60 acres in 1958; (6) installment payment in 1964 arising from sale of 20.5724 acres in 1958; Kettering subdivision: (7) sale of Calvert tract in 1965. ↩
11. Unless otherwise stated, statutory reference are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
12. It is not without significance that the petitioners neither offered Kilby as a witness nor furnished any explanation for their failure to do so. See Jerome J. Sonnenborn, 57 T.C. 373, 383↩ (1971). 13. Unless otherwise provided in a ground lease agreement, Maryland ground rents are redeemable only after the expiration of five years. Md. Code Ann. art. 21, section 112 (1951). The rent reduction agreements which Turner entered into with respect to each ground lease were therefore unnecessary to create the five-year no-redemption period which Turner supposedly desired but apparently did not enforce. ↩
14. Compare Commissioner v. Simmers' Estate, 231 F.2d 909, 915 (C.A. 4, 1956), affirming 23 T.C. 869 (1955) (dissent of Parker, J. ). Prior to the enactment of section 1055, when a real estate developer sold houses on land leased to the purchaser under an annual ground rent, the courts refused to find a sale of the land even though the purchaser had the right to "redeem" the ground rent at any time after five years. Commissioner v. Simmers' Estate, supra; Welsh Homes, Inc., 279 F.2d 391 (C.A. 4, 1960), affirming 32 T.C. 239 (1959). Section 1055, added to the Code by P.L. 88-9, overrules these cases by providing that a "redeemable ground rent" is treated as a mortgage, so that the lease of land for such a rent is treated as a sale subject to a mortgage. See H. Rept. No. 24, 88th Cong., 1st Sess. (1963); S. Rept. No. 72, 88th Cong., 1st Sess. (1963), 1963-1 C.B. 417↩. The ground rents involved herein were created prior to the enactment of section 1055, and are therefore unaffected by that section. We nevertheless consider Turner's purpose for creating the ground rents in the first instance as highly probative of his purpose for holding them at the time of the redemptions. 15. See J. Thomas Requard, T.C. Memo. 1966-141 (25 TCM 732↩, 750-753). In this connection, it may be noted that a ground lessor has locked himself into a fixed rent and redemption price of the demised property at the time the lease is created, despite any subsequent appreciation in the market value of the property. 16. As having a bearing on Turner's purpose in holding the Calvert tract, we note that paragraphs 6 and 7 of the October 4, 1965 contract between Turner and MCD imposed an affirmative obligation in the latter to obtain certain rezoning. See p. 38, supra. ↩
17. This amount consists of the sum of a first mortgage of approximately $251,552 and the net amount of the assumption by MCD of a second mortgage representing the difference between the original principal amount of $275,000 and the $83,000 liability in effect retained by Turner. ↩
18. Respondent does not challenge Turner's right to use the installment method for reporting the transaction, because the payments in the year of sale would not exceed 30 percent of the selling price even if the $275,000 is counted as such a payment. ↩
19. Magnolia Development Corp., T.C. Memo. 1960-177↩, relied upon by the respondent, is distinguishable on this basis. Compare Daniel D. Palmer, 62 T.C. $ (August 27, 1974). We think the use which Turner made of the loan proceeds is beside the point, although the record establishes that he in fact used such proceeds for good business purposes. 20. The October 4, 1965 contract does not specify that the 75 acres were to come from the Belt tract but the record herein clearly reveals that this was the intention of MCD and Turner and the parties have not argued otherwise. ↩
21. Since Turner retained liability on $83,000 of the $275,000 mortgage, the deduction for mortgages assumed should be reduced by that amount. See footnote 17, supra. ↩
22. Turner did not receive the 75 acres of the Belt tract until 1967, a year not before us, but the character of the gain is necessarily determined in this proceeding. In this connection, we note that although respondent argues that such acreage was worth in excess of $4,000 per acre, he nevertheless accepts that valuation for purposes of the computation involved herein. ↩
23. See generally Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369↩ (1971). 24. Petitioners, in making their computation of debt-equity ratios, omit, without explanation or reason, the amount of MCD's construction loans. ↩